[No. C. D. 4972. *En Banc.* September 29, 1960.]

*In the Matter of the Application of* ROBERT BOLAND BROOKS
*for Admission to Practice Law in the State
of Washington.*[1]

*Kenneth A. Cox, Little, LeSourd, Palmer, Scott & Slemmons, Donald S. Voorhees,* and *Riddell, Riddell & Williams,* for applicant.

*T. M. Royce,* for board of governors.

*Arthur G. Barnett* and *Walter Walkinshaw, amici curiae.*

MALLERY, J.—This is an application in this court for permission to take the bar examination. The application recites that the board of governors has denied his previous application upon the ground that he was "not a man of good moral character."

The applicant has been a resident of this state since 1946. He is a citizen of the United States and is fifty years of age. In 1933, he graduated from Columbia University law school, which is approved by the American bar association. He was admitted to practice law in the state of New York in 1934.

The finding that the applicant is "not a man of good moral character" is predicated upon his conviction of a

[1]Reported in 355 P. (2d) 840.

felony for which he served approximately twenty-two months of a three-year sentence in a Federal penitentiary. The facts in his case are stated in *Brooks v. United States,* 147 F. (2d) 134, as follows:

"The appellant, a citizen residing within the Southern District of New York, whose age made him subject to classification under the provisions of the Selective Training and Service Act of 1940, duly registered with his local board and, having established his status to be that of a conscientious objector under § 5 (g) 50 U. S. C. A. Appendix § 305 (g), was classified as IV-E. He was examined as to his mental and physical fitness and, having been found fit, was ordered to report, for transportation to Civilian Public Service Camp No. 111 at Mancos, Colo. He then refused to report for that purpose and so notified his local board. Having persisted in such refusal, he was indicted, tried, convicted, and sentenced under § 311 of the Appendix to Title 50 U. S. C. A. and has appealed.

"The constitutional questions now raised are not new and have uniformly been decided adversely to the contentions of the appellant in cases like Weightman v. United States, 1 Cir., 142 F. 2d 188, and Heflin v. Sanford, 5 Cir., 142 F. 2d 798. The federal government in the exercise of its undoubted power to raise and maintain armed forces for the protection of the country could have disregarded the appellant's conscientious scruples against participating in such service and conscripted him for any military service for which he was mentally and physically fit. United States v. Macintosh, 283 U. S. 605, 622, 623, 51 S. Ct. 570, 75 L. Ed. 1302. Having respected his conscientious objection to all such service, even to the extent of granting him exemption from non-combatant duty, Congress could in the exercise of its incidental power do whatever was reasonably necessary and appropriate to raise and maintain armed forces provided that those who were given exemption from such service be required to perform such work of national importance as they were able to perform under reasonable rules and regulations. There are many good reasons which may have led Congress so to provide but it is enough that such action may have been considered needed during a great national emergency for its effect upon the morale of those who do serve in the armed forces. As was said in United States v. Schwimmer, 279 U. S. 644, 651, 49 S. Ct. 448, 450, 73 L. Ed. 889, 'The influence of conscientious objectors against the use of military force in defense of the

principles of our government is apt to be more detrimental than their mere refusal to bear arms.' See also Kiyshi Hirabayashi v. United States, 320 U. S. 81, 99, 63 S. Ct. 1375, 87 L. Ed. 1774."

The board of governors made the finding:

"That if the applicant, Robert Boland Brooks, be found to be a man of good moral character, he has otherwise complied with all of the requirements necessary to entitle him to take the bar examination as a general applicant."

The act of the board of governors in finding that the applicant is not a man of good moral character, is not arbitrary or capricious. We adopt its finding that "The acts of the applicant . . . were unjustifiably defiant of the laws of the United States."

No one has contended that this court should overrule the board of governors and admit a person to practice *while* he is feloniously refusing noncombatant service in aid of his country's war effort. Instead, the theory presented is that the applicant's defect of character is of a temporary nature and does not survive an elapse of time sufficient to end the war and the national emergency. This temporary defect is considered as having no future implications because the applicant is most unlikely, at his present age, to have another opportunity to set personal example of resistance to the Nation's war efforts. It is therefore considered immaterial that there has been no substantial change in his felonious principles to which he adheres, by his own statements, to this very day.

We are not inclined to adopt a transitory theory as to the applicant's character. Age alone has not reduced his potential for war resistance to zero. Personal example is neither the only nor most effective way of exemplifying his felonious principles. An old lawyer can impede his country's war effort in many ways as well as a young one.

It should go without saying that we are not here concerned with any additional punishment of the applicant for his past felony. He has served his sentence and he is permanently at large. Nevertheless, his character, with his fixed refusal to aid a war effort, is directly and neces-

sarily in question when he seeks admission to practice law.

On the credit side of applicant's character is his laudable preoccupation with civil liberties. Indeed, the rights of individuals, as such, are the very essence of liberty as we know and seek to implement it.

On the debit side of the ledger is his felonious denial of any *duty* related to the enjoyment of these individual liberties. A loyal and discerning citizen is aware of his great heritage of liberty and acknowledges his duty to do his share in preserving it. Without a sense of duty, the applicant does not measure up to the standard of citizenship rightly expected of an attorney at law.

We are not prepared to find that the board of governors acted arbitrarily and capriciously.

The application is denied.

OTT, J., concurs.

WEAVER, C. J., DONWORTH, and HUNTER, JJ., concur in the result.

FINLEY, J. (concurring in the result)—This case poses an old, philosophically debatable, problem. It involves a head-on collision between two diametrically opposite opinions or ideas as to moral values.

The problem may be dramatically illuminated by the following: (1) Is war and the killing of human beings therein moral or immoral? (2) Is (a) refusal to bear arms for one's own country, or alternatively, (b) refusal to serve in a work or labor camp in time of war, moral or immoral?

On the one hand, emphasizing patriotism, majority rule and welfare in a democratic society such as ours, there is the view, held by most citizens, that all have a duty or obligation—in essence a moral or morally defensible one—to support and defend our country in time of war. Contrariwise, underlining good faith matters of individual conscience or religion, there is the view held by Mr. Brooks (the applicant herein) and, generally, by conscientious objectors that (paraphrasing Voltaire) the killing of human beings in wartime is immoral, and nonetheless murder,

despite the numbers involved and the sound of trumpets.

The fact that the differing viewpoints are by their proponents held most strongly and in good faith, and that each view can be rationalized in terms of well meaning, constructive social objectives, complicates rather than simplifies the problem.

Generally speaking, in a legal context of standard and orthodox dimensions, recognition of an inconsistency in moral values may seem surprising, with even an appearance or sound of strangeness. However, in terms of common experience, differences of opinion as to moral values actually should not seem too surprising. In any event, with the problem in this appeal in the above-indicated posture, it follows that it is not one to be resolved by reference to absolute or objective standards; nor is it a matter of compromise and attempting to work out a nice balance between competing or conflicting ideas. The case simply has no easy, black-or-white solution. Decision requires a clear-cut choice and approval of one or the other of two inconsistent moral values, each having strong, persuasive, emotional overtones. In other words, I am convinced that the decisional function herein is purely and simply a matter of value emphasis and personal judgment. While philosophical discussion can be intense and spirited, usually stress and strain, in terms of conscience, emotions, and personal responsibility, is minimal. In contrast, judicial decision herein has been most troublesome for me, in terms of conscience, emotions, and personal responsibility, and I daresay for other members of this court.

In the instant case it is clear that the applicant, Robert Boland Brooks, has for many years, as a matter of conscience or religion, been opposed to war and military service, labor, or work camps, and to conscription of any kind in times of war. During World War II, he made his position known forthrightly and unequivocally to his local draft board and to the local office of the United States district attorney. He did register for the draft; but, when ordered to report for his physical examination, he refused to comply and duly notified the draft board of his intention. He was,

in fact, classified as a conscientious objector (4-E) by his local draft board. Thereafter, he was ordered to report to a labor camp for conscientious objectors which was maintained under the selective service system at Mancos, Colorado. Mr. Brooks again forthrightly advised both his draft board and the United States attorney's office that he would not comply with the order. Thereupon, he was indicted and convicted for violation of the selective service act. The United States Court of Appeals affirmed his conviction (*Brooks v. United States,* 147 F. (2d) 134); and the United States Supreme Court denied certiorari (324 U. S. 878, 89 L. Ed. 1430, 65 S. Ct. 1027). It should be pointed out that Mr. Brooks was convicted not because he refused to serve in the armed forces of his country, *but solely* because of his refusal to report to the wartime labor or work camp for conscientious objectors.

At the time of trial, Mr. Brooks waived a jury. His only defense was that the selective service act, which he admitted having violated, contravened what he conceived to be his constitutional rights. He made a formal statement, setting forth his reasons for refusing to report to the Colorado work camp, saying among other things:

"I do not believe that under the Constitution Congress has the right to deny freedom of conscience, *or to compel men to do an act which their conscience tells them is morally wrong.*" (Italics mine.)

Incidentally, he further stated that he hoped to convince others, by his example, to share his views.

Finally, at the hearing before the board of Governors of the State Bar Association on his application for admission to the practice of law in the state of Washington, Mr. Brooks, in effect, represented that he did not think the situation which confronted him during World War II could occur again because of his age, and otherwise; but, if it should, he felt that his course of conduct would likely be the same as before, although his experience in prison (upon his conviction he served twenty-two months of a three-year sentence) was one he would not wish to undergo again.

As will be gathered from the foregoing, our task is to determine whether Mr. Brooks' conduct and attitude, and his felony conviction for violating the Selective Service Act, disqualifies him on moral grounds for the practice of law in this state.

The authority of this court to promulgate rules setting forth the qualifications to be met by an applicant for the practice of law in this state is unquestioned. Of course, the qualifications set forth must bear some rational connection to the applicant's overall fitness for the practice. *Schware v. Board of Bar Examiners of New Mexico* (1957), 353 U. S. 232, 1 L. Ed. (2d) 796, 77 S. Ct. 752, 64 A. L. R. (2d) 288.

The dissenting opinion herein states the case for Mr. Brooks, in terms of positive moral values, as strongly as could be done. It refers to the history of conscientious objection to war in our country. In effect, the dissent concludes that good faith matters of conscience supervene and transcend policy and law of temporal governments; that conscientious objection to war, and *conduct patterned accordingly, is not immoral, but, on the contrary, is highly moral in nature.* I certainly can understand and wish for the universal acceptance, application and legal validity of this point of view. However, the dissent's thesis is the statement of an *ideal,* which, unfortunately, has not yet been achieved. We do not live as individuals; nor do nations exist in an ideal world society, free from war, controlled and ordered by an ideally conceived world rule of law.

The Selective Service Act accorded to Mr. Brooks the status of a conscientious objector. As a matter of national policy, it excused him from compulsory military service. However, the act did not excuse him, as a matter of policy or otherwise, from noncompliance with its conditional requirement that he report to a work camp for conscientious objectors. This conditional requirement was, I think, under all the circumstances, a reasonable, rational, and even a morally justifiable one. The Selective Service Act actually did not outlaw Mr. Brooks' freedom of belief; in fact, in

giving him the status of a conscientious objector and excusing him from compulsory military service, the act recognized his freedom of belief and, I think, provided reasonable latitude relative to action and conduct. In my judgment, with emphasis on the practicabilities of the far-from-ideal world society in which we live, the refusal of Mr. Brooks to comply with the conditional requirement of the act—that he report to a work camp—was unreasonable and not morally justifiable. Furthermore, I believe a rational connection exists between Mr. Brooks' conduct and his fitness to practice law. At the same time, I cannot agree with the rather broad implication of the majority opinion that a conscientious objector *per se* is morally unfit to practice law in this state.

The crux of this matter as I see it is Mr. Brooks' past and present basic position—that the government cannot compel him to do any act which, in terms of conscience or religious concepts, he personally believes to be morally wrong—manifested by (a) his affirmative conduct in refusing to report to the work camp in Colorado when ordered so to do, (b) his felony conviction, and (c) his current affirmation of views and previous conduct, evidenced by testimony at the hearing before the Board of Governors of the State Bar Association.

Undoubtedly, under the advocacy concept of our legal system, attorneys are expected to question and, in a sense, to oppose government policies and law in a legal, orderly manner in seeking to protect either their own personal interests or those of their clients. However, at the same time, members of the legal profession are officers of our courts. As such they, perhaps more than other citizens, have a basic duty of obedience to the law and a fundamental obligation to sustain and support the government of which they are citizens—particularly in times of national emergency.

In my best judgment, Mr. Brooks has, by his attitude and conduct (evidenced by the record), demonstrated traits of character which do not have to be approved and countenanced by the members of the legal profession of our

state. I believe that, under the *"rational connection"* test announced in *Schware v. Board of Bar Examiners, supra,* the particular traits of character displayed by Mr. Brooks disqualify him for the practice of law in the state of Washington.

Parenthetically, or by way of epilogue: If, as understandably may happen, this matter should be the subject of further appellate review by the United States Supreme Court, we, as a state court, shall of course accede to the resolution of this matter as reached in that court. However, in my opinion, one would be hard put to find any significant basis for making a distinction between the nature of the judicial function here and there, insofar as the instant case is concerned. In other words, review on the merits would simply mean nothing more than a substitution of personal value emphasis and judgment by a majority of the members of the United States Supreme Court for the personal value emphasis and judgment of a majority of the members of our own state supreme court. Lastly, if there should be further appellate review, it can be hoped that the result, whatever it is, may be articulated as realistically as has been attempted herein.

On the basis indicated hereinbefore, I concur in the disposition of this matter recommended by the Board of Governors, and in the result reached in the majority opinion.

HILL, J. (dissenting)—The board of governors of the Washington state bar association has refused the application of Robert Boland Brooks to take the bar examination.

The majority has, with admirable brevity, set out the gist of this controversy in these words:

"The board of governors made the finding:

" 'That if the applicant, Robert Boland Brooks, be found to be a man of good moral character, he has otherwise complied with all of the requirements necessary to entitle him to take the bar examination as a general applicant.'

"The act of the board of governors in finding that the applicant is not a man of good moral character, is not arbitrary or capricious. We adopt its finding that 'The acts of the applicant . . . . were unjustifiably defiant of the laws of the United States.' "

The applicant asks that we review the evidence before the board of governors; and that we conclude therefrom that he is a man possessing good moral character, and entitled to take the bar examination.

The final determinations in questions of admission and disbarment are, of necessity, ours; but we attach great importance to the determinations of the board of governors relative both to admissions and to disciplinary proceedings. The board renders a tremendously valuable service in these areas; indeed, an indispensable one. We do not, however, as the majority seems to hold, have to find that the board acted arbitrarily or capriciously before we can arrive at a conclusion different from that of the board on the same record. *State ex rel. Laughlin v. Washington State Bar Ass'n* (1947), 26 Wn. (2d) 914, 176 P. (2d) 301; *In re Levy* (1945), 23 Wn. (2d) 607, 161 P. (2d) 651, 162 A. L. R. 805; *In re Bruen* (1918), 102 Wash. 472, 172 Pac. 1152; *McVicar v. State Board of Law Examiners* (D. C. Wash. 1925), 6 F. (2d) 33. See also *In re Day* (1899), 181 Ill. 73, 54 N. E. 646, 50 L. R. A. 519.

The issue is: Does the record before the board of governors, and now before this court, disclose that the applicant does not possess a good moral character? In one sense, it is a very narrow issue; yet, paradoxically, it is very broad. This is true because our concept of what constitutes moral turpitude, or what constitutes a good moral character may be widely divergent.

There are things the applicant has done that I would not do; there is much that he believes, with which I would disagree. I find it difficult to comprehend the appeal for the shelter of the constitution by one who is unwilling to defend it. I look askance at one who, asserting his right to freedom of religion, refuses to have any part in resisting an enemy who declared war upon us and whose first act in every land invaded was to abolish freedom of religion. Nothing that the applicant has done or believes, however, convinces me that he is not a man of good moral character acting in accordance with the dictates of his conscience.

The applicant asked, and was accorded, the status of a

conscientious objector—opposed to combatant and noncombatant military service. No one has seriously suggested that being a conscientious objector *per se* establishes an absence of good moral character, although the majority seems to imply as much in this sweeping statement near the end of the opinion:

" . . . A loyal and discerning citizen is aware of his great heritage of liberty and acknowledges his duty to do his share in preserving it. Without a sense of duty, the applicant does not measure up to the standard of citizenship rightly expected of an attorney at law."

This overlooks the fact that there may be a conflict between duty to God and duty to country. Duty to a moral power higher than the state has always been maintained. Long ago, Mr. Justice Story in his Commentaries on the Constitution of the United States, Vol. II (5th ed.), § 1876, p. 631, said:

" . . . The rights of conscience are, indeed, beyond the just reach of any human power. . . ."

Mr. Chief Justice Hughes in his famous dissent in *United States v. Macintosh* (1931), 283 U. S. 605, 627, 75 L. Ed. 1302, 51 S. Ct. 570, in which he was joined by Justices Holmes, Brandeis, and Stone, said (p. 633):

" . . . But, in the forum of conscience, duty to a moral power higher than the State has always been maintained. The reservation of that supreme obligation, as a matter of principle, would unquestionably be made by many of our conscientious and law-abiding citizens. . . ."

and, further (p. 634):

" . . . And, putting aside dogmas with their particular conceptions of deity, freedom of conscience itself implies respect for an innate conviction of paramount duty. . . ."

However, as a conscientious objector opposed to both combatant and noncombatant service, the applicant was still subject to the requirement that he perform "work of national importance" under civilian direction. (See § 5 (g) Selective Training and Service Act of 1940, 54 Stat. 889, 50 U. S. C. A. Appendix § 305 (g).)

It was the applicant's refusal to report to a so-called civilian public service camp to perform such "work of national importance," which the board of governors found to be "unjustifiably defiant of the laws of the United States."

The applicant was indicted, tried, and convicted for his refusal to report to such a camp.

It is here that we must find the real basis, if there is any, for the finding that the applicant is not a man of good moral character.

Certainly the conscientious objector sent to a civilian public service camp was treated as a "second-class citizen." He was

". . . compelled to labor in Civilian Public Service without remuneration. His dependents had to fend for themselves without government aid or benefits of any kind. He was left financially unprotected in case of injury or death during his service, except where he was assigned to work covered by state workmen's compensation laws. These three severe financial penalties were deliberately inflicted on men who allowed their consciences to direct them into civilian rather than military service.

"This made a virtual farce of freedom of conscience. In practice, men had to pay for their conscience by the impoverishment not only of themselves but of their families. . . . In the opinion of the American Friends Service Committee, such a situation could not 'long continue without jeopardy to the health of our democracy. Equal respect and consideration for the welfare of all its citizens should prevail if we are to maintain the foundation principles of our nation.'" Conscription of Conscience, Sibley and Jacob, pp. 216, 217.

On his trial in the United States district court for failure to report for transportation to a civilian public service camp for work of "national importance," and on his appeal from a conviction for that offense to the circuit court of appeals for the second circuit, the applicant at all times took the position that he was conscientiously opposed (by reasons of religious training and belief) to any form of compulsory labor in civilian camps; and he also raised certain constitutional issues, including: whether the service

required constituted involuntary servitude or the taking of "property" without just compensation.

In the briefs submitted by the board of governors much is made of the fact that the applicant raised these additional issues, in addition to his claim that he was a conscientious objector to such service. To me, they were issues he was entitled to raise, and took nothing away from his stand as a conscientious objector.

His conviction was affirmed. He served twenty-two months of a three-year sentence before he was paroled.

The applicant was defiant of the laws of the United States. He deliberately chose the alternative of imprisonment in a penal institution to service in a civilian public service camp. Does that brand him as having committed an act involving moral turpitude, and as a man "not of good moral character"? I think not. Through the centuries men and women have suffered death and imprisonment rather than forfeit their integrity of conscience.

I am not saying that his imprisonment was not justified; from the standpoint of the government, there was no reasonable alternative. The Selective Service Act demanded the most serious sacrifices from men of the same general class as the applicant. The morale of those in the armed forces required that conscientious objectors should not wholly escape all service. Relieving the conscientious objector entirely of any obligation to render services would obviously not accord with the principle of equality upon which the Selective Service Act is based. If conscientious objection to military service were rewarded by complete exemption, it would be more difficult to distinguish between men who are honestly urging conscientious objections and those urging such objections for personal, material benefits. As said in *Weightman v. United States* (1944 C. C. A. 1st) 142 F. (2d) 188, 192:

" . . . If conscientious objectors should simply be excused from the burden of military duty cast upon other men of like age, employment and family responsibilities, thereby leaving them free to enjoy civilian life, no doubt some, maybe many, men would falsely profess conscientious objections only to obtain the privileged status of

exemption. To weed out the insincere and thus avoid an obvious abuse, the way of the honest conscientious objector has been made hard. . . ."

I am saying, however, that having refused—because of adherence to a firmly-held principle—to go to a work camp; and having paid the penalty of imprisonment for twenty-two months, does not indicate a lack of moral character.

A recent holding is that one can be "unjustifiably defiant of the laws of the United States," and refuse to pay an income tax, and still not be guilty of an offense involving moral turpitude. In *In re Molthan* (1958), 52 Wn. (2d) 560, 562, 327 P. (2d) 427, Molthan filed returns but refused to pay taxes because

" ' . . . he maintained he was a second class citizen of the United States by virtue of the fact that he had been, without trial, denominated a security risk, and that such a finding denied to him his usual employment as an attorney.' "

Let us suppose that, in 1776, certain colonists believed so strongly that there should be no taxation without representation that they went to prison rather than pay certain taxes. Did a breach of duty to obey the law and imprisonment therefor establish a lack of moral character, or did it establish that they were men of deep and strong convictions?

It is well established that Henry David Thoreau, whose essay entitled On the Duty of Civil Disobedience is a classic, was jailed in Concord for his refusal to pay his poll tax— a protest against a government that supported slavery. There is a legend that his friend Ralph Waldo Emerson visited Thoreau in jail, and asked "Henry, why are you here?" and that Thoreau rejoined "Waldo, why are you not here?"

I am challenged, in a day when the trend is to sacrifice principle to expediency, by one who preferred to go to jail rather than do what his conscience said he should not do. In any event, I can find no moral turpitude here, and no lack of moral character.

Finally, there is no rational connection between the

claimed ·disqualifying acts and the applicant's fitness to practice law. *Schware v. Board of Bar Examiners of New Mexico* (1957), 353 U. S. 232, 1 L. Ed. (2d) 796, 77 S. Ct. 752, 64 A. L. R. (2d) 288, quoted in *In re Flynn* (1958), 52 Wn. (2d) 589, 328 P. (2d) 150.

I would enter an order directing that Robert Boland Brooks' application to take the Washington state bar examination be granted.

FOSTER, J., concurs with HILL, J.

ROSELLINI, J., concurs in the result of the dissent.