291 Md. 182 (1981)
433 A.2d 1159
IN RE APPLICATION OF G.S. FOR ADMISSION TO THE BAR OF MARYLAND
[Misc. No. 3, September Term, 1981.]
Court of Appeals of Maryland.
Decided September 8, 1981.
The cause was argued before MURPHY, C.J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.
Gary S. Mininsohn for applicant.
RODOWSKY, J., delivered the opinion of the Court.
G.S. seeks admission to the Bar. For a period of two or three months following his first year of law school, he engaged in a series of petty thefts until he was caught. Because we are not convinced of his full and complete rehabilitation, we shall not order his admission.
The applicant was born January 4, 1951 in New York. He resided through his high school years in New Jersey. His parents were divorced when he was 16. He obtained a bachelor's degree from a university in Massachusetts in *183 1973. G.S. has been regularly employed in various full-time jobs thereafter. He married in March 1974. In August 1976 G.S. began the study of law in Maryland in an evening program. In February of 1977 he obtained a job selling baby pictures in the suburban Washington, D.C. area. This work involved calling on customers at their homes. Some months after entering this line of work, G.S. began to steal pills from his customers. By his admission to the State Board of Law Examiners (the Board) the applicant would, in the course of a sales visit to a customer's home, request permission to use the bathroom where he would search for, and steal, what he describes as "sleeping pills." G.S. acknowledges committing such thefts on 20 or 30 occasions prior to his arrest. He was caught on August 26, 1977. The suspicions of one of his customers had been aroused when a neighbor of that customer found pills to be missing after an earlier sales call by G.S. at the neighbor's home. Apparently the suspecting customer left a predetermined number of pills in plain view in the bathroom during G.S.'s visit. G.S. pocketed six of them and was charged with petty larceny.[1]
His counsel recommended that G.S. seek treatment from a psychiatrist. At the trial on January 17, 1978 G.S. entered a plea of guilty. A sentence of 30 days was suspended, with 12 months probation. However, it appears that the court indicated that reconsideration might be in order following psychiatric treatment. On or about January 27, 1978 counsel for G.S. filed a motion for reconsideration which in part asserted that the psychiatrist was of the opinion probation before judgment, without any treatment condition, should be granted so that the psychiatrist could "begin an effective treatment without coercion." Probation before judgment, under Md. Code (1957, 1976 Repl. Vol.), Art. 27, § 641, was granted February 8, 1978.
The record in the instant proceedings does not contain any testimony by, or report from, this psychiatrist. G.S. testified that he stopped seeing the psychiatrist in March of 1978 *184 because it was too expensive. G.S. estimates he had 25 or 30 sessions, each of one hour, with this psychiatrist. There were two sessions a week for three months and then one per week for one month. This would mean that the psychiatric treatment started some time in November of 1977, more than two months after the arrest.
In October 1978 the applicant was charged with leaving the scene of a property damage accident.[2] G.S. engaged counsel who recommended that he resume psychiatric treatment. The applicant's wife also threatened to leave him if he did not resume treatment. G.S. pleaded guilty. He says he did this on the advice of counsel. The applicant states that he had no intention to leave the scene of the accident, which occurred at night when he struck a car standing on an unlighted, two lane roadway with no shoulders. He says he stopped 450 feet from the point of impact at the first place where he could safely park his car. When the partner of the attorney who had appeared with G.S. at trial learned of these circumstances, the partner sought reconsideration and obtained probation before judgment.
The counseling which the applicant received following the automobile accident was by a psychologist in the Howard County Health Department. Unlike the $50 per hour which the Baltimore psychiatrist had charged, these sessions cost him $2.00 per hour. There were 19 one hour sessions between November 1978 and May 1979. The psychologist suggested terminating the sessions and this was mutually agreed. If there were any recurrence of aberrant behavior, G.S. was to contact the psychologist again, but he has not felt the need to do so.
The applicant worked as a law clerk in the Attorney General's Office during his third year of law school. He and his wife separated about the time he began his fourth year of evening law studies, and they are apparently now divorced. During his fourth year of studies, G.S. worked as an aide in the office of a District Public Defender in suburban *185 Washington. He graduated from law school and passed the July 1980 bar examination. Three attorneys who first met the applicant in the summer of 1979 testified before the Character Committee to his present good character. G.S. is now an underwriter for a title insurance company where he has been promoted, with an increase in salary.
G.S. denies ever having had any problem with drugs or alcohol. He says that he did not sell or give the stolen pills to third parties. Some of them he ingested, either before going to his next customer call or at home. He says that many times he simply threw the stolen pills away, particularly if he was not certain what they were. He cannot explain his behavior. G.S. describes the psychiatrist as indicating his problem stemmed from anger over his parents' divorce. The psychologist never defined his condition for him, "other than the way she phrased it I had a problem in growing up and it was a matter of perceiving myself and the things around me in terms of, you know, an adult maladjustment, to use a term."
At his hearing before the Character Committee, the applicant presented a letter from the Howard County psychologist which confirmed individual therapy sessions had commenced in November of 1978 and which then stated:
His original complaints or issues seemed to be aberrations of behavior. In addition to his coming faithfully, [G.S.] not only worked diligently in and out of the sessions on these particular behavioral issues but also made many positive changes on others.
Because of his resolution of old issues and current sustained stability, I suggested termination as of May 29, 1979.
The Character Committee recommended to the Board that the applicant be admitted. Prior to its hearing of January 16, 1981 the Board orally advised the applicant's attorney, and advised the applicant in writing, that the psychologist should be produced at the hearing or there should be produced "a more descriptive and detailed report from the psychologist *186 with respect to her diagnosis and prognosis." The psychologist did not appear before the Board. Applicant's counsel explains that when he had asked the psychologist to appear, she had expressed concern over divulging privileged communications, but a written waiver was furnished. She then declined to appear because of the pressures of work at the Howard County clinic but offered to participate in a telephone conference call with the Board. At the Board hearing, the Chairman pointed out that the Board felt that the report submitted to the Character Committee "left something to be desired in terms of the diagnosis, the treatment and prognosis regarding [the applicant's] psychiatric state at that time...." The Chairman said that if the psychologist "is willing to submit a more extensive report than she has submitted up to this point that might suffice ...." At the conclusion of the hearing applicant's counsel stated he would ask the psychologist "to submit a letter as quickly as possible."
After the hearing the psychologist submitted a three paragraph letter which stated that G.S. had requested counseling "in order to resolve some aberrations of behavior." Evaluation showed "no mental illness diagnosis  Adjustment Reaction to Adult Life." It said that G.S. nevertheless requested to have therapy "to resolve the circumstances surrounding several incidents that he wished to understand and hopefully never repeat." There were 19 one hour sessions. The psychologist's "reason for termination was that [G.S.] had not only completely resolved the original aberrations of behavior, but in the process made positive changes in other facets of his life."
The Board recommended the admission of G.S. While it found the psychologist's post-hearing "report" to be "lacking in specificity," the report indicated to the Board general agreement on the part of the psychologist that G.S. had "overcome his prior problems."
The test which this Court must apply here was stated in In re Application of David H., 283 Md. 632, 640-41, 392 A.2d 83, 88 (1978):

*187 There can be no doubt ... that thievery of a repetitive nature, as here, is usually indicative of a serious character flaw. Hence, in such cases, the evidence of rehabilitation must be entirely convincing if the applicant is to carry his heavy burden of proving present good moral character.
In this case, the record is clearly inadequate to carry that burden. The crux of the applicant's case is that his present moral character fitness justifies his admission to the Bar and that his repetitive thefts were the result of a temporary aberration which no longer exists and of which there is no danger of recurrence under the stress of representing clients. The evidence of rehabilitation in this case rests primarily on the opinion of the psychologist. Yet, the report furnishes no insight into why a 26-year-old college graduate who has completed one year of evening law school study would repeatedly engage in petty thievery while an invitee in the homes of his customers. The report gives no explanation of how this compulsion, if indeed it were a compulsion, has been treated. It furnishes no reasons why the applicant's rehabilitation should be considered full and complete. Viewing the report most charitably, it seems to reflect a lack of appreciation of the serious effect which repetitive theft by an adult law student has on the difficult task of determining present moral character fitness for admission to the Bar.
On the record before us we are not satisfied that G.S. has unequivocally demonstrated his full and complete rehabilitation.
It is so ordered.
NOTES
[1] A companion charge of possession of controlled dangerous substances was nol prossed.
[2] A companion charge of driving under the influence was dropped because the breath test did not support it.