[No. B.A. 2. En Banc. November 1, 1984.]

*In the Matter of* JIMI T. WRIGHT.

BRACHTENBACH, J.—This case involves an application for admission to the State Bar Association.

Jimi T. Wright, the applicant, graduated from law school, twice failed the bar examination, then passed the July 1982 examination. After several hearings, the Board of Governors of the Bar Association recommended admission. By order we denied admission.

Wright petitioned for reconsideration on the merits and alternatively for clarification of his status as to future application for admission.

We deny reconsideration on the merits, set forth our rationale on the merits and clarify Wright's status as to future application.

In 1973 Wright was convicted by a jury of second degree murder while armed with a firearm, a firearm for which he had applied for a permit, but which permit was not yet valid at the time of the killing. He was sentenced to not more than 20 years. He appealed; the conviction was affirmed. *State v. Wright*, 12 Wn. App. 585, 530 P.2d 704, *review denied*, 85 Wn.2d 1006 (1975). He was represented at trial and on appeal by an able and experienced criminal defense attorney.

While his appeal was pending, Wright was free on bail. In 1974 he was charged with possession of heroin. In his application for an APR 9 status Wright represented that he was charged with possession of .25 gram of heroin. In fact he pleaded guilty to possession of .65 gram. He was sentenced to 5 years, suspended on condition that he serve 1 year in the county jail; he did so. Again he was represented by an able and experienced criminal defense lawyer.

In July 1975, after his conviction was affirmed, his minimum term was set at 10 years with a 5–year mandatory. He served 3 years 8 months in the institution. He was paroled and was discharged from parole in February 1983.

This court has the inherent power to admit or not admit

to the bar association applicants quite apart from and independently of the recommendation of the Board of Governors. In an early case, *In re Bruen,* 102 Wash. 472, 476, 172 P. 1152 (1918), we said:

> It is true that the judicial power of this court was created by the constitution, but upon coming into being under the constitution, this court came into being with inherent powers. Among the inherent powers is the power to admit to practice, and necessarily therefrom the power to disbar from practice, attorneys at law. Formerly attorneys were admitted in various courts. The legislature, with a view of bringing about uniformity in the requirements and standards for admission of attorneys, conferred the whole matter of admission of attorneys upon this court, and this court is the only court entitled to admit and enroll attorneys in the state of Washington.
> . . .
> . . . The power to admit, so far as the statutes of this state are concerned, is vested in the supreme court. The cases are fairly uniform upon the proposition that admitting to practice, suspending, and disbarring are judicial functions.

"The authority of this court to promulgate rules setting forth the qualifications to be met by an applicant for the practice of law in this state is unquestioned." *In re Brooks,* 57 Wn.2d 66, 72, 355 P.2d 840 (1960), *cert. denied,* 365 U.S. 813, 5 L. Ed. 2d 692, 81 S. Ct. 694 (1961) (Finley, J., concurring in the result). *Accord, In re Ellis,* 118 Wash. 484, 203 P. 957 (1922); *In re Levy,* 23 Wn.2d 607, 617, 161 P.2d 651, 162 A.L.R. 805 (1945); *In re Chi–Dooh Li,* 79 Wn.2d 561, 565, 488 P.2d 259 (1971).

This power is recognized in the Admission to Practice Rules. The former APR 5(d) provides that after receipt of the Board of Governors recommendation, "[t]he Supreme Court may thereupon examine the recommendation and accompanying papers and make such order in each case as it deems advisable." The former APR 5(e) provides that "[t]he Supreme Court shall enter an order admitting to practice those applicants *it* deems qualified . . .". (Italics ours.)

The former APR 2(b)(3) requires that an applicant be of good moral character. The former APR 5(g) mandates an oath of attorney that he is fully subject to the laws of the State of Washington and will abide by the same.

 While the Code of Professional Responsibility applies to admitted lawyers, its provisions provide guidance by analogy to evaluate the fitness of an applicant to be admitted. We can look to CPR for guidance in setting admission standards. CPR DR 1–102(3) mandates that a lawyer shall not "[e]ngage in illegal conduct involving moral turpitude." *In re Stroh,* 97 Wn.2d 289, 644 P.2d 1161 (1982). CPR EC 1–6 states that an applicant for admission to the bar may be unqualified, temporarily or permanently, for other than moral or educational reasons. CPR EC 1–5 provides that "[o]bedience to law exemplifies respect for law."

A lawyer is an officer of the court. This means that an attorney must have respect for the court, the laws under which the system operates and indeed, the entire legal system. Inherent therein is his respect for the rights of others, including their lives.

The twin questions of good moral character and fitness to practice law escape precise definition. We are impressed by the analysis of the Florida court. In *Florida Bd. of Bar Examiners. Re: G.W.L.,* 364 So. 2d 454, 458 (Fla. 1978) it said:

> In our view, a finding of a lack of "good moral character" should not be restricted to those acts that reflect moral turpitude. A more appropriate definition of the phrase requires an inclusion of acts and conduct which would cause a reasonable man to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of the state and nation.
>
> . . . The inquiry into good moral character which emphasizes honesty, fairness, and respect for the rights of others and for the laws of this state and nation is a proper and suitable standard for those who desire to be

an integral part of the administration of justice in the courts of this state.

*See also In re Willis,* 288 N.C. 1, 215 S.E.2d 771, *appeal dismissed,* 423 U.S. 976, 46 L. Ed. 2d 300, 96 S. Ct. 389 (1975). Nonetheless, we have no doubt that the taking of a life under circumstances amounting to second degree murder does not exhibit good moral character. Wright offers extenuating circumstances, but the jury rejected his contentions in a trial found by the Court of Appeals to be free of reversible error.

We are much disturbed by the fact that in the 123 pages of the report of the proceedings before the Board of Governors, where Wright was the only witness, there is not a single expression of remorse for the murder of the victim. Rather, he characterizes it as "bad judgment." No sorrow, no regret expressed, just "bad judgment."

In his letter of application to take the bar examination he stated:

I believe that you should permit me to take the Bar Examination in spite of my felony convictions, because neither of those convictions represent a breach of any fiduciary duties. They don't involve any acts of dishonesty.

The standards set by this court are not so narrow.

This court has taken a strict posture on moral character; a felony conviction for violation of the selective training and service act precluded admission. *In re Brooks, supra.*

Other courts have been similarly strict. *In re G.S.,* 291 Md. 182, 433 A.2d 1159 (1981) (felony conviction for custodial interference and giving of perjured testimony in dissolution proceedings). *Lark v. West,* 289 F.2d 898 (D.C. Cir.), *cert. denied,* 368 U.S. 865, 7 L. Ed. 2d 63, 82 S. Ct. 114 (1961) (attorney denied admission to federal district court for conviction of mail fraud); *In re Dillingham,* 188 N.C. 162, 124 S.E. 130 (1924) (admission denied for convictions of larceny, fraud and extortion among others).

Wright has cited no cases and we have found none where a convicted murderer has been admitted.

In addition to his murder conviction, while awaiting his unsuccessful appeal, Wright was arrested and subsequently pleaded guilty to possession of heroin. Again he offers extenuating circumstances, yet he did plead guilty, largely to avoid being labeled a "snitch" if his murder conviction required him to serve his sentence in an institution.

Good moral character, abide by the laws of the state, not engage in illegal conduct, obedience to the law—these characteristics appear to be missing in the commission of these two felonies.

Another matter discloses Wright's fitness to practice law. On his application for admission Wright described part of his employment as a "researcher." Upon inquiry by bar counsel the following was elicited:

Q On your application you indicate that you were a researcher apparently for a relatively short period of time.

A Yes.

Q Was that a legal researcher?

A Yes. It was legal and nonlegal. People would own a barber shop—I knew a couple of people that owned private businesses and they hired me to incorporate them or research ideas for the expansion of their business. I got two such jobs and with that I thought that I could maybe make a go at it if I could get enough work, but I couldn't get enough work and so I decided to take the job back at the Human Rights Department.

Q What do you mean when you say people would hire you to incorporate?

A Specifically I knew two people that owned private businesses, a barber and a beautician, and one of them paid me to draw up papers of incorporation and advise them as to whether or not incorporating would be advisable as opposed to a sole proprietor. I got those two assignments real early and I was under the illusion that if I got enough work like that, maybe I could continue working for myself.

Q Did you do those things, draw up the incorporation papers?

A At first I drew them up and then I advised them as to which would be to his advantage, and in both cases it

would not have been to either party's advantage to incorporate, in my own opinion.

Q Did you do this in connection with an attorney or just on your own?

A No, I did this on my own.

Q Did you make any differentiation in your mind between that and the practice of law, drawing up the incorporation papers and advising people which course to take?

A Yes. I didn't think I was practicing law. I thought I was just giving them an opinion. He knew I wasn't a lawyer and I didn't hold myself out to be a lawyer. It was the same kind of thing that a business graduate could have done.

Q Is it your understanding that a business graduate could draw up incorporation papers and advise people whether or not to do so?

A I don't know. I am not a business graduate, but I would think maybe they could.

Simply put, a person who for a fee advises whether to incorporate and then draws articles of incorporation, and who does not think he is practicing law is not qualified to practice that profession.

Perhaps his attitude and understanding of the profession is best found in his own words:

. . . I was exploring the liabilities of a business of an individual operating a business as a sole proprietor as opposed to being incorporated. That didn't seem to involve anything that was particularly within the realm of practicing law. . . . It didn't cross my mind that I was attempting to practice law and I didn't say I was giving him legal advice.

Despite his perseverance and despite apparently successful efforts at rehabilitation, we do observe that his time from discharge from parole is relatively short; we conclude that the total circumstances of Wright's background do not warrant admission. Again, his words, without remorse, "I am a bit more stable now" are not sufficient to meet our high standards.

As to future application for admission, we cannot now set the standards which may influence a future Board of Gov-

ernors or a future decision by this court. The applicant may submit an application to the Board of Governors when he desires. Its recommendation will be forwarded to this court for determination.

Admission denied.

DORE and DIMMICK, JJ., and CUNNINGHAM, J. Pro Tem., concur.

WILLIAMS, C.J. (dissenting)—The sole issue before us is whether Jimi T. Wright possesses the requisite good moral character for admission to the bar. Few applicants have so amply demonstrated their good moral character or singular dedication to the high ideals of the profession than has Mr. Wright. I can only conclude that the majority's denial of his application is based on an unstated premise that a person convicted of a violent crime cannot be rehabilitated. I am otherwise unable to reconcile the denial with our past readiness to find that persons who once committed nonviolent, but dishonest, conscious, and deliberate crimes against their clients, or the public have been rehabilitated. Mr. Wright's application and file evidence a compelling history of struggle to overcome his past wrongs. His application is supported by letters from numerous lawyers, law professors, employers, police officers, public officials, and others who have worked with him and know his past, and by the Board of Governors recommendation. All are unequivocal in their belief in Mr. Wright's good moral character.

At the outset, I concede that I agree with the majority that the commission of either second degree murder or possession of a controlled substance indicates lack of good moral character. I also agree that our inquiry should look to the applicant's honesty, fairness, and respect for the law and the rights of others. Further, I agree that the Code of Professional Responsibility is an appropriate guide of admission standards. I disagree, however, with the majority's disregard of Mr. Wright's successful efforts toward rehabilitation, and his demonstrated commitment to

improving himself. I disagree with its focus on facts that only arguably constitute unauthorized practice of law. I disagree with its conclusions regarding his expressions of remorse. I disagree that insufficient time has elapsed to judge his character. I disagree with the majority's failure to acknowledge either the recommendation by the Board of Governors or the letters sent by the many individuals who believe that Mr. Wright is possessed of good moral character and would be a credit to the profession.

## I

Because the majority's discussion of the record is so abbreviated, I think it is necessary to set out in detail Mr. Wright's scholastic and employment history. The following facts appear in the record. The applicant grew up in a Chicago ghetto, one of seven children. He was the first in his family to graduate from high school. He went to Illinois state universities on a scholarship and eventually earned his undergraduate degree. He took the Law School Admission Test once in Illinois, and then later in Seattle, apparently scoring relatively low on both. He sought admission to the University of Washington Law School, but was told that his chances of admission would be greater if he took a 10-week prelaw writing skills program for minority students, sponsored by the Council on Legal Education Opportunity. He went to Denver and completed that program and was eventually enrolled at the University of Washington School of Law.

Mr. Wright successfully completed 2½ years of law school before the crimes occurred. The first crime was the homicide. Wright claims he acted in self-defense, and, as the majority notes, the jury apparently did not believe him. Nevertheless, there are some undisputed facts about the killing that are relevant to the issues in this case.

The homicide victim, William Morris, was married to but separated from Wright's girl friend who lived with Wright for a short time. Morris was not a student and did not live near campus. Morris was jealous of Wright's involvement

with Morris' wife. He threatened Wright on several occasions and beat him with a pistol at least once. Wright moved away from his girl friend to avoid Morris. Wright says he reported these assaults to police, but did not press charges. Instead, he bought a pistol. One night, while on campus on his way home from the library, Wright saw Morris coming toward him, carrying a bag. Wright claims that Morris said something to Wright and reached in the bag. Wright thought Morris was reaching for a gun, so Wright grabbed his own pistol and shot Morris. Wright attended Morris as best he could, at least to the extent of putting his coat under Morris' head, called police, and stayed with Morris until the police's arrival. Morris died the next day. A search of the bag Morris was carrying showed that he was carrying a gun at the time he was shot.

These facts show that: (1) Morris came to the campus, armed with a pistol, to engage Wright in some sort of encounter; (2) Wright did not plan or premeditate the shooting; and (3) Wright called police immediately and did not try to hide his involvement in the shooting. The prosecutor apparently recognized these facts, and offered to accept a guilty plea to manslaughter, but Wright, feeling he was innocent because he acted justifiably in self–defense, refused. He was charged and convicted of second degree murder.

Wright continued his law studies while his conviction was on appeal. It was at this time that he was charged and pleaded guilty to possession of heroin. Wright contends that he was unaware that he was carrying a packet of heroin, and explains its presence as follows: He was attending a party in celebration of the birth of his daughter. He received several gifts including a wallet given him by a musician in attendance. He did not look in the wallet, but instead put it in his pocket. On his way home, the police stopped him for having a defective taillight on his car. He was detained because of an outstanding parking ticket. Wright was searched, and later told that the wallet con-

tained a packet of heroin.[1] His own words best explain his decision to plead guilty to possession rather than contest the charge which would have required his naming the person who had given him the wallet:

> I was in a dilemma then. I felt if my conviction was not reversed and I had to start serving time, if I went to jail after telling on this guy—it is commonly referred to as being a snitch—that my life wouldn't be worth very much. When you go in prison—and you don't have to know this by firsthand experience—when you go into jails and you are labeled as a snitch, it is very dangerous for you, coupled with the fact the officer said there may not be anything that they could do. I was afraid to tell this [police officer] . . . because I thought that it would subject me to some danger so I didn't tell and I had to take it. I had to take the punishment.

Hearing before Washington State Bar Association Board of Governors, at 36–37 (Feb. 14, 1981).

Wright was incarcerated almost 5½ years for his crimes: 1 year in the county jail, 18 months in the Monroe Reformatory, 16 months at the minimum security Monroe Honor Farm, and finally 14 months at a work–training release program in Bellingham. Throughout this period Wright was an exceptional prisoner.

During his jail term he continued his legal studies and completed a term paper for a seminar on corporations. The seminar professor stated in a letter to the Board of Governors dated December 8, 1980, that Wright wrote a "very solid" paper, despite his incarceration. This professor also wrote: "I can only marvel at Mr. Wright's determination to

---

[1]The majority intimates that Wright was not forthright in his application when it says, "Wright represented that he was charged with possession of .25 gram of heroin. In fact he pleaded guilty to possession of .65 gram." Majority opinion, at 856. My reading of the facts differs. Wright pleaded guilty to an unspecified quantity of heroin. What Wright in fact said regarding the amount of heroin in the wallet was, "[t]he following morning I was told that the substance was heroin, about ¼ of a gram with a street value of $25.00." Letter to Board of Governors dated January 20, 1981. The .65 gram quantity is mentioned only in the omnibus application of the prosecuting attorney. There is no way of knowing whether Wright ever saw this, or knew the quantity actually found. It is certainly unfair to imply that this minor discrepancy was an active fabrication.

complete law school and become a lawyer." The professor stated that Wright was "extremely conscientious" as a student, and would "make a significant contribution as a member of the bar."

While in prison at Monroe, Wright was chairman of the Black Prisoners Caucus and an apparently stabilizing influence during several disturbances. In addition to working at the prison library, Wright taught English and American History to inmates working for their high school equivalency degrees. He also taught such classes during his jail term. Wright's conduct as a prison inmate was exemplary.

A counselor during his incarceration at Monroe Reformatory stated in a letter to the Board of Governors dated January 15, 1981:

> I remember Jimi as being a responsible resident who took his obligations seriously both inside the prison system and with his family. . . . His conduct while being in prison was without blemish and he maintained a positive attitude during his entire incarceration. He was ambitious and used his time constructively in furthering his personal enlightenment and planning for the future. . . . I feel that this young man is of high moral character and that he would indeed b[e] an asset to the legal profession.

Wright also received favorable reports from his work release program in Bellingham. While there he worked for the Whatcom County Opportunity Council (WCOC) writing grant proposals for programs intended to provide emergency housing and low income housing. He also accompanied a Bellingham police officer to high schools where he was a speaker in the schools' law and justice program. His employers at WCOC, his counselors at work release, and the Bellingham police officer all stated that Wright was a credit to their programs, and that he is of good moral character.

A counselor with the work release program stated:

> During this time he established a superior degree of credibility. He demonstrated strengths in many areas: rapport maintenance, accountability, goal development, and approachability. . . . Jimi earned the respect and

support of all the Staff here. We are strengthened by having shared in his struggle.

Letter to Board of Governors dated December 3, 1980.

Wright never abandoned his goal of completing law school, even while in prison. He reapplied to the University of Washington Law School as soon as he was paroled. The dean at the time denied his application, but that decision was overturned by the faculty. As a condition of readmission, he was required to retake the second and third years of law school. Thus, to obtain his juris doctor degree, Wright was required to complete over 4½ years of law school—1½ years more than all but a very small number of the bench and bar of this state.

At least nine members of the University of Washington faculty wrote that Wright was a dedicated and conscientious student. Most of these professors saw Wright over a total of 5 years, so their views on his character should be accorded some weight. One stated that Wright was a "serious, hard–working, and deeply committed student." Letter to Board of Governors dated December 4, 1980. Another found Wright to be "a sober and wholly responsible person who will prove to be a credit to the Bar." Letter to Board of Governors dated December 11, 1980. Another stated that "The Jimi Wright who returned to this Law School in 1977 is not the same person who committed a violent crime. . . . I [am] convinced that today's Jimi Wright is a man whose sense of responsibility will make him a credit to the [bar]." Memorandum to Board of Governors dated December 3, 1980. Still another professor stated that Wright "is an honest and forthright individual, and I would not hesitate to entrust him with my personal affairs." Letter to Board of Governors dated December 1, 1980.

During his final year at the law school Wright served as a part–time legal intern with the Seattle Human Rights Department, drafting administrative rules and doing legal research. His supervisor there stated that Wright approached each task "with the kind of seriousness and dedication which . . . are characteristic of his approach to

most of his undertakings." Letter to Board of Governors dated December 5, 1980. The Director of the Human Rights Department expressed similar views. After Wright graduated he worked full time for the Department. During that time he also volunteered his time to the Central Seattle Youth Services Bureau, an agency that works with young criminal offenders. As a result of his work there he was appointed to that agency's policy board. He did volunteer work for Seattle's CAMP, the Central Area Motivation Program. As with his other endeavors, members of CAMP wrote letters of recommendation. Finally, Wright served as an intern with the Seattle Human Rights Department's Minority Business Enterprise Program where, again, his work was commended.

As noted by the majority, Wright was eventually granted permission to take the bar examination, which he passed. The Board of Governors of the Bar Association conducted three different hearings to determine whether Wright should be admitted to practice. On April 16, 1983, the Board found that Wright was of good moral character and recommended to this court that he be admitted. The vote was 6 to 1, with 3 abstentions.

## II

Having reviewed these facts in the record, the question is, should this applicant be admitted to the practice of law? Former APR 2(b)(3) requires that an applicant possess good moral character. The burden of establishing good moral character is on the applicant. *See Nall v. Board of Bar Examiners*, 98 N.M. 172, 646 P.2d 1236 (1982); *Hallinan v. Committee of Bar Examiners*, 65 Cal. 2d 447, 421 P.2d 76, 55 Cal. Rptr. 228 (1966).

This court has not published any decisions defining good moral character for purposes of former APR 2(b)(3). The court has, however, decided numerous cases discussing the factors to be considered in readmitting a previously disbarred attorney. By analogy, these factors are useful in deciding whether to admit first time applicants. The factors

this court has considered are:

> (a) the applicant's character, standing, and professional reputation in the community in which he resided and practiced prior to disbarment; (b) the ethical standards which he observed in the practice of law; (c) the nature and character of the charge for which he was disbarred; (d) the sufficiency of the punishment undergone in connection therewith, and the making or failure to make restitution where required; (e) his attitude, conduct, and reformation subsequent to disbarment; (f) the time that has elapsed since disbarment; (g) his current proficiency in the law; and (h) the sincerity, frankness, and truthfulness of the applicant in presenting and discussing the factors relating to his disbarment and reinstatement.

*In re Eddleman,* 77 Wn.2d 42, 44, 459 P.2d 387, 461 P.2d 9 (1969); *see also In re Johnson,* 92 Wn.2d 349, 351, 597 P.2d 113 (1979). These criteria require us to examine the types of crimes the person has committed, the applicant's conduct since the crimes were committed, his efforts to rehabilitate himself, and his standing in the community. I believe that examination of each of these criteria shows that Mr. Wright has met his burden of proving his good moral character.

The first matters to consider are the crimes Wright has committed. Second degree murder is a serious, violent crime. It is a crime involving moral turpitude, for it shows disrespect for the law and for the rights of others. *See In re McGrath,* 98 Wn.2d 337, 342, 655 P.2d 232 (1982). The facts surrounding the crime, however, show that there were some mitigating circumstances. Wright was assaulted by the victim at least twice before the shooting, he knew that the victim was armed, and he had at least some reason to fear for his own life. The jury found these facts were insufficient to find Wright innocent by reason of self–defense, but they do show that this was a crime of passion, unlikely to be repeated. There is no indication in the record of any other violent acts by Wright, either before or after the shooting.

The second crime was possession of heroin. This crime

also shows disrespect for the law. But despite the felonious nature of the crime, possession of heroin is less morally reprehensible than other crimes that have been committed by attorneys who have been admitted to practice in this state. *See, e.g., In re Johnson, supra* (attorney readmitted, who had committed grand larceny by stealing money he held in trust for incompetent client); *In re Batali,* 98 Wn.2d 610, 657 P.2d 775 (1983) (similar); *In re Krogh,* 93 Wn.2d 504, 610 P.2d 1319 (1980) (attorney readmitted who had conspired to commit burglary). Attorneys who steal their clients' funds present much more danger to the public and to the integrity of the bar than does one who has once possessed a small amount of heroin.

In short, both crimes are serious and would likely result in disbarment if Wright had been a member of the bar at the time committed. Nonetheless, the character of the crimes relevant to Wright's fitness disclose: (1) neither crime involved deceit, theft, breach of trust, or violation of a fiduciary responsibility; (2) neither crime is likely to be repeated; and (3) 11 years have passed since the last crime was committed.

An important consideration is whether the applicant has been candid to the bar association regarding his crime. An applicant's failure to answer fully all questions from the bar association may indicate that, as a lawyer, the applicant would conceal facts from judges, clients, or opposing counsel. In this case, Wright has cooperated fully with the bar association in its investigation. He has provided detailed and apparently truthful responses to all inquiries. This fact weighs in favor of admission.

The applicant's recognition of the wrongfulness of his prior conduct is another important consideration. In deciding whether to readmit an attorney we must ask "whether the petitioner has affirmatively shown that he has overcome those weaknesses that produced his earlier misconduct." *Johnson,* at 350. The majority concludes that this element is not present as Wright is not sufficiently remorseful for the murder. Expressions of remorse are but one way of

demonstrating that the applicant recognizes the wrongful-
ness of his conduct. It is simply unreasonable to expect a
display of repentance from a person who has steadfastly
maintained that his actions were necessary to preserve his
own life. On the other hand, the bar association hearing
transcript and Wright's letters and petition express regret
for the chain of events that resulted in the killing. Wright
has shown by his words and his conduct that he has over-
come the weaknesses that led to his earlier misconduct. He
stated: "The manner in which I have approached life in the
past 10 years should demonstrate, if nothing else, that
measure of maturity one expects of a professional, coupled
with a desire to redeem past faults. I have always accepted
responsibility for my past, and I have worked quietly but
continuously to put my life in order." Affidavit and Argu-
ment in Support of Motion for Reconsideration, at 3–4.

Far more important than Wright's words, however, is his
conduct since committing the crimes. This is the major
issue in the case, and the majority has absolutely ignored it.
The question is: Has this applicant proved by his conduct
that he has rehabilitated himself, and that he now pos-
sesses good moral character? *See In re Krogh,* at 507. The
evidence is overwhelming that Wright has worked hard to
"pay his debt to society", and to acquire those skills and
attributes required of a lawyer. Both in and out of prison,
Wright has compiled a record of community service that
surely surpasses that of most applicants to the bar. He has
diligently pursued his legal education, and has earned the
praise of his teachers, employers, and colleagues.

Wright's successful rehabilitation is illustrated by his
standing and reputation among his colleagues and in the
community. As noted above, this record contains a host of
recommendations from a wide variety of people. It is true
that almost anyone can find a few people who will write a
letter of recommendation. The sheer number and variety of
Wright's recommendations, however, show that these are
not merely letters from biased friends. It is apparent that
in each of Wright's endeavors in the last 10 years, his asso-

ciates, supervisors, and teachers have found him to be intelligent, hard working, and trustworthy. These letters, from unbiased sources who have observed his behavior over an extended period of time, should be accorded great weight. In California such recommendations would be prima facie evidence of good character. *See Hallinan v. Committee of Bar Examiners,* 65 Cal. 2d 447, 421 P.2d 76, 55 Cal. Rptr. 228 (1966). The majority does not deem these letters of sufficient importance to even mention although they constitute the bulk of the record.

The majority does mention one incident that occurred immediately after Wright graduated from law school. After graduating Wright offered to give advice to two people on whether they should incorporate their small businesses. He researched the issue, drew up papers of incorporation, but advised them that incorporation was not in their best interests. The people were aware that Wright was not an attorney.

The majority reviews these facts and states:

> Simply put, a person who for a fee advises whether to incorporate and then draws articles of incorporation, and who does not think he is practicing law is not qualified to practice that profession.

Majority opinion, at 861.

It may be simple for the majority, but it is not that simple for me. Wright never held himself out to be a lawyer. He never gave the articles of incorporation to the small business, and the papers were never used. Is merely giving an opinion on whether to incorporate the practice of law? Possibly so, possibly not, but the question I must ask is, is the majority really denying Mr. Wright's admission to practice based on this fact? I cannot believe that it is.

The present investigation into Wright's character was not prompted by any allegation that he has engaged in the unauthorized practice of law. The bar association has been involved with this case for over 4 years, and not one

member of that organization has ever charged that Wright illegally practiced law. The counsel for the bar association never notified Wright that this would be an issue. Wright had no opportunity to rebut charges that he was not qualified to practice based on this incident. The Board of Governors made no finding on this issue. The record is simply not sufficient to draw any legitimate conclusions. The majority has raised this issue for the first time on appeal, and then decided it without a fair hearing.

A final factor to consider is the Board of Governors recommendation. After a hearing at which Wright testified the Board voted to recommend to this court that Wright be admitted to practice. The Board, unlike this court, had the opportunity to see and hear Wright's testimony, and to ask questions. Their finding that Wright possesses good moral character also weighs in favor of admission.

### III

Defining "good moral character" is difficult, as the majority states. One letter writer to this court correctly wrote that good moral character "is not easily definable—I suppose most of us recognize its absence more readily than its presence." Letter to Board of Governors dated January 12, 1981. Still, a great many people with firsthand knowledge of Jimi Wright are convinced of its presence in him, and have endeavored to demonstrate it to us.

Mr. Wright has committed two very serious felonies. If the record consisted of only these two felonies, I would agree that Wright should not be admitted to practice law. But the record contains much more. All the people who wrote to this court and to the bar association state that Wright is competent, trustworthy, serious, dedicated, and intelligent. The only evidence to the contrary consists of the two convictions, now over 11 years old. The majority opinion stands as an inflexible rejection of the view that a person can redeem himself from past violations and can work to become a useful and productive citizen. I believe

Mr. Wright has proven himself worthy to be admitted to practice. I therefore dissent.

UTTER, DOLLIVER, and PEARSON, JJ., concur with WILLIAMS, C.J.