[No. 1599. En Banc. January 16, 1992.]

*In the Matter of the Disciplinary Proceeding
Against* RICHARD W. HART, *an
Attorney at Law.*

*W. Wesselhoeft, Shawn Otorowski,* and *Ferguson & Burdell,* for petitioner.

*Robert D. Welden,* for Bar Association.

GUY, J. — Richard W. Hart was disbarred by this court in 1977 following his conviction for misuse of estate assets that came into his charge as trustee. He petitions for reinstatement. We deny the petition.

## BACKGROUND

Richard W. Hart is 62 years old. Upon graduation from high school, Mr. Hart entered the United States Air Force and received a bad conduct discharge. In 1949, he was convicted of burglary. In 1950, he joined the United States Coast Guard, receiving a dependency discharge in 1952. Mr. Hart then entered San Francisco State University, where he was nominated to a Woodrow Wilson Fellowship at Stanford University. He received his Bachelor of Arts degree in 1959. Mr. Hart performed graduate work in economics and Asian languages at the University of Washington and was granted a Ford Foundation scholarship to study Asian law, entering the University of Washington Law School in 1964. In 1967, Mr. Hart graduated from the University of Washington Law School, where he had been a member of the Law Review. Mr. Hart immediately joined a Seattle law firm where he was assigned commercial collection litigation matters. After

approximately 6 months, Mr. Hart left that law firm and entered into a solo private practice. Mr. Hart worked long hours developing a good client base in collection and bankruptcy. He achieved financial success.

As a part of his bankruptcy practice, Mr. Hart was appointed trustee for various estates by the judges of the Bankruptcy Court for Western Washington. In 1969, Mr. Hart was appointed trustee of the estate of Mr. and Mrs. Raymond Questad and a corporation wholly owned by them. One of the assets of the estate was a house which had an encumbrance approximately equal to the appraised value. As trustee, Mr. Hart attempted to sell the house but was unable to do so. In 1970, he obtained an order of abandonment from the Bankruptcy Court. The effect of such an order is to revert the property to the bankrupt. Thereafter, Mr. Hart approached Mr. and Mrs. Questad and advised them that he wished to purchase the house. Mr. Hart caused Mr. and Mrs. Questad to deed the property to his brother-in-law with the understanding that Mr. Hart would pay the secured encumbrances against the property. Mr. Hart then arranged with the mortgagee bank to permit a reinstatement of the mortgage in favor of the brother-in-law upon payment of the delinquent payments and late charges owing. Mr. Hart had been notified by the bank that it would foreclose the mortgage. Mr. Hart did not disclose to the Bankruptcy Court or to the bank that he was the real party in interest. As a part of the overall acquisition and mortgage reinstatement plan, Mr. Hart obtained a court order permitting estate rental income from the property to be used to make the payments to the bank for the reinstatement. Mr. Hart and his family moved into the house, using it as their personal residence.

In 1975, Mr. Hart was indicted in the United States District Court for Western Washington on two counts of violating 18 U.S.C. § 153 (1970), which at that time provided in pertinent part:

> Whoever knowingly and fraudulently appropriates to his own use, embezzles, spends, or transfers any property . . . belonging to the estate of a bankrupt which came into his

charge as trustee, receiver . . . or other officer of the court, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The allegations in the indictment charged that Mr. Hart, when acting as trustee, had: (1) appropriated property of the estate to his own use; and (2) used trust funds from the estate to pay the mortgagee bank to reduce the first mortgage on the property. On December 5, 1975, the United States District Court found Mr. Hart guilty on both counts, sentencing him to 3 years in prison. This sentence was reduced by the district court judge to 1 year, with actual time served being 9 months. On February 2, 1977, this court ordered that Mr. Hart be disbarred, based upon the fraud convictions in the United States District Court.

At the time of Mr. Hart's disbarment, an investigation was conducted of the accounts of other estates for which he had acted as either receiver or trustee, and no improprieties were noted. There had been no finding of misconduct on the part of Mr. Hart during his years of practice, when he had opened more than 6,000 case files.

Mr. Hart's conviction, sentence, and disbarment caused him to become estranged from his wife. Upon release from prison, Mr. Hart engaged in various business activities, including managing apartment buildings and finding opportunities for others to buy real property or to buy judgments through sheriff's sales.

In 1981, Mr. Hart applied for reinstatement to the Washington State Bar Association. The Board of Governors recommended against his reinstatement by a vote of 4 to 3. The Board was concerned about Mr. Hart's failure to inform the Board that he had been a party to a United States Tax Court action concerning his personal taxes for 1972. In that action, Mr. Hart was found subject to a penalty for tax fraud. The Board also found inadequate Mr. Hart's explanation of a shortage of approximately $3,500 in an account he had managed as a receiver for an estate in bankruptcy.

Mr. Hart did not respond to the Board's recommendation against his reinstatement, and consequently his petition

was deemed abandoned and not considered by this court. In 1985, Mr. Hart filed a second reinstatement petition, but he withdrew it after he learned that counsel to the Washington State Bar Association would oppose the application.

Following his unsuccessful 1981 reinstatement petition, Mr. Hart became involved in the health club business. He acquired a financially unsuccessful club in Everett, and later two other health clubs in Bellevue and Seattle. Through intelligence, good business practices and hard personal work, Mr. Hart made those ventures profitable.

In his present application for reinstatement, Mr. Hart states that every 6 weeks or so he obtains advance sheets and looks through them for cases that interest him. He testified that he follows legislative developments and is a member of a committee that drafts comments to the Attorney General regarding health club legislation.

On November 17, 1990, the Board of Governors held a public hearing regarding Mr. Hart's present reinstatement petition. By a divided vote of 6 to 4, the Board recommended reinstatement, subject to the conditions that Mr. Hart (1) report monthly to monitoring counsel, to be designated by the Supreme Court; (2) be required to pass the Washington State bar examination, paying costs incident to the reinstatement; and (3) be subject to any other conditions the Supreme Court might impose.

## ISSUE

The issue presented is whether Mr. Hart has overcome those weaknesses which produced the conduct for which he was disbarred, demonstrating that his reinstatement will not be detrimental to the integrity and standing of the bar, the administration of justice, or the public interest.

## ANALYSIS

■ The most recent reinstatement case is *In re Moynihan*, 113 Wn.2d 219, 221, 778 P.2d 521 (1989), where this court declared:

> The major consideration in reinstatement proceedings is whether the disbarred attorney has overcome those weaknesses which produced the earlier misconduct.

This is a threshold consideration. No attorney who has failed to overcome those weaknesses that produced the conduct for which he or she was disbarred is fit for reinstatement.

In *In re Eddleman*, 77 Wn.2d 42, 459 P.2d 387, 461 P.2d 9 (1969), this court defined rules of guidance and evaluation criteria for reinstatement proceedings. The *Eddleman* court held that an applicant for reinstatement must be clearly shown to be worthy of the public trust placed in attorneys, as well as that "he possesses the qualifications and meets the relevant requirements for admission to the practice of law, and that his reinstatement will not be detrimental to either the integrity and standing of the bar, the administration of justice, or the public interest." *In re Eddleman*, at 43.

■ The *Eddleman* court then set forth eight criteria to be utilized to review a reinstatement petition:

> (a) the applicant's character, standing, and professional reputation in the community in which he resided and practiced prior to disbarment; (b) the ethical standards which he observed in the practice of law; (c) the nature and character of the charge for which he was disbarred; (d) the sufficiency of the punishment undergone in connection therewith, and the making or failure to make restitution where required; (e) his attitude, conduct, and reformation subsequent to disbarment; (f) the time that has elapsed since disbarment; (g) his current proficiency in the law; and (h) the sincerity, frankness, and truthfulness of the applicant in presenting and discussing the factors relating to his disbarment and reinstatement.

*In re Eddleman*, at 44.

The *Eddleman* criteria for reinstatement implement, but do not replace, the requirements of RLD 9.6(a), which states:

> Reinstatement may be recommended by the Board of Governors only upon an affirmative showing that the petitioner possesses the qualifications and meets the requirements as set forth in the Admission to Practice Rules for lawyer applicants, and that his or her reinstatement will not be detrimental to the integrity and standing of the judicial system or to the administration of justice, or be contrary to the public interest.

*See In re Moynihan*, *supra* at 221-22.

We are not persuaded that Mr. Hart has met his burden of demonstrating that he has overcome the weaknesses producing his earlier misconduct or sufficiently satisfied the requirements of *In re Eddleman, supra*.

A number of factors weigh against reinstating Mr. Hart. Testimony taken during Mr. Hart's reinstatement hearing revealed that he failed to file federal income tax returns for tax years 1983-86, and that tax liens had been filed by the Internal Revenue Service for the years 1980-82. Mr. Hart testified that during these years his family was living on his limited income, and that he feared reporting his earnings to the Internal Revenue Service would lead to an attachment, preventing him from providing for his family. Mr. Hart stated that when he was financially secure, he retained attorney Leland Bull and sought to clarify the tax delinquencies. On Mr. Bull's advice, Mr. Hart filed under Chapter 11 of the federal bankruptcy code in 1987 and obtained IRS acceptance of a confirmed reorganization plan under which Mr. Hart pays tax indebtedness at the rate of $757.29 per month, with payments to be completed in January 1996.

 Mr. Hart's failure to file his personal federal income tax returns raises the concern that Mr. Hart analyzes ethical questions not out of respect for the law, but out of a concern for personal expedience. The testimony of Mr. Hart before the Board of Governors in response to a question by Governor Howell is particularly disturbing in this respect. Governor Howell asked Mr. Hart whether he believes personal expedience justifies not filing tax returns. Mr. Hart answered:

> This is a very difficult problem. I'm not trying to be contentious or flippant, okay? I was shocked to discover that the people in the Donner party ate their friends, but if you get hungry enough, you're probably going to do things you don't want to do, okay? I reiterate the same answer time after time after time. It was a difficult choice, I intended to pay the taxes. I stepped forward voluntarily to pay the taxes. I didn't step forward at a time you may have stepped forward. You may not have stepped forward if you had been in my position and you may have, I don't know. I am telling you that when you are faced with really difficult choices, people in concentra-

tion camps do terrible things to their friends. They didn't do that because they were evil people or they wanted to do those things, and I know my situation is certainly not comparable to that, but what I'm saying is when you have difficult choices to make, you may make a wrong choice. They're not made because you're out there telling people, "Don't do this," the consequences of my acts are severe and I have accepted those consequences and I realize that I did wrong and I should have paid and I think I have paid it and I have struggled beyond your comprehension to get back into this business and to be able to function as a professional person again in this community, and I think I am entitled — not entitled — but I believe it's justifiable to reach that conclusion. I don't like making those decisions, I would rather face it.

Report of Proceedings, at 147-48. While there are business aspects to the practice of law, there are overriding principles of professional ethics to which attorneys must adhere, even when doing so is personally inconvenient. Willingness to pay a penalty for an ethical violation does not eliminate the wrongfulness of the act. Nor is risk analysis a proper means of disposing of ethical questions. An attorney must subordinate personal convenience to respect for the law.

Events leading to the Chapter 11 filing are also of concern. Attorney Leland Bull, who submitted the Chapter 11 filing for Mr. Hart, testified that he did not file the bankruptcy petition on behalf of Mrs. Hart, even though she was Mr. Hart's spouse. Mr. Bull stated that this was because Mr. Hart told him that he and his wife were legally separated. Mr. Hart admitted in testimony making such a statement, but he claimed that he had meant to convey only that he and his wife had not resided together for a number of years, not that they were legally separated for tax filing purposes.

The dissenting members of the Board found this confusion regarding Mr. Hart's marital status to be a matter of concern. We agree. Prior to his disbarment, Mr. Hart practiced bankruptcy law. We are skeptical that Mr. Hart was blind to the significance of being considered legally separated from his wife for purposes of his Chapter 11 filing. Such skepticism, although alone not determinative, weighs against reinstatement. *See In re Eddleman*, at 43 ("If doubt

remains [as to a reinstatement applicant's fitness], fairness to the public and the bar requires that reinstatement be denied.").

Another factor weighing against reinstatement concerns certain tax returns of Mr. Hart's health club corporations. Testimony taken during the hearing revealed that corporate returns for 1987, 1988, 1989 and 1990 had not been filed as of the date of the Board's hearing. In his testimony, Mr. Hart admitted that the filings were delinquent, but he emphasized that taxes had been paid for 1988 and 1989, and that a trust account of over $25,000 was available for payment of other years' taxes based upon the final agreement between his accountants and the Internal Revenue Service.

As in the case of Mr. Hart's personal tax returns, however, we are concerned that Mr. Hart too easily succumbs to the temptation to elevate what is personally expedient over respect for the law. We believe this is the weakness that produced the earlier misconduct for which Mr. Hart was disbarred. A letter written by an attorney who practiced law with Mr. Hart is revealing on this point. The letter is dated March 8, 1977, and is addressed to Judge Morell Sharp, the United States District Court judge who sentenced Mr. Hart for the 18 U.S.C. § 153 violations. The attorney was writing in support of a motion to shorten Mr. Hart's sentence, but he also stated:

> I testified at the trial that Mr. Hart was "result oriented" and that his practice of law was marked by a tendency to achieve results quickly, once those results are identified, even at the expense of ethics. I believe that Richard has always lacked that high sense of professionalism and ethics which are so essential in a practitioner and which, had he possessed it, would have protected him against the kind of "short-cutting" that has brought him to his present tragic position.

Thus, at the time of his disbarment, Mr. Hart's colleague characterized him as inclined to take shortcuts to achieve results quickly, and as lacking a sense of ethics. Mr. Hart's more recent failure to file his personal and corporate federal

tax returns timely, his representations to Mr. Bull regarding his marital status, and, generally, his willingness to elevate personal expedience over respect for the law, leave us unpersuaded that he has overcome those weaknesses producing his earlier misconduct and leading to his disbarment.

We do not, by denying Mr. Hart's petition for reinstatement, minimize or denigrate Mr. Hart's achievements as an individual or as a businessman. However, a high burden is required for those who seek reinstatement after disbarment. Applicants for reinstatement must establish that they have overcome the weaknesses that produced the misconduct for which they were disbarred. Mr. Hart has not met this burden. We are not satisfied that the interest of the public and justice to the legal profession will be served by Mr. Hart's reinstatement.

Petition denied.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, DURHAM, and SMITH, JJ., concur.

JOHNSON, J. (dissenting) — A decision whether to reinstate a disbarred attorney requires analysis of the eight criteria established in *In re Eddleman*, 77 Wn.2d 42, 44, 459 P.2d 387, 461 P.2d 9 (1969). Although the majority opinion recognizes as much, and goes so far as to list the *Eddleman* factors, the remainder of the analysis is not tied to these factors. The majority's disparate treatment of the petition in this case cannot be justified.

The majority also fails to give sufficient weight to the Board of Governors' findings of fact in this case. The Board's evaluation of the *Eddleman* factors led it to recommend that Richard W. Hart be conditionally reinstated. Because I agree with the Board's analysis and result, I dissent from the majority's denial of Hart's petition for reinstatement.

The eight *Eddleman* criteria for evaluating a disbarred attorney's petition for reinstatement read as follows:

> (a) the [petitioner's] character, standing, and professional reputation in the community in which [the petitioner] resided and practiced prior to disbarment; (b) the ethical standards which [the petitioner] observed in the practice of law; (c) the nature and character of the charge for which [the petitioner] was disbarred; (d) the sufficiency of the punishment undergone in connection therewith, and the making or failure to make restitution where required; (e) [the petitioner's] attitude, conduct, and reformation subsequent to disbarment; (f) the time that has elapsed since [the petitioner's] disbarment; (g) [the petitioner's] current proficiency in the law; and (h) the sincerity, frankness, and truthfulness of [the petitioner] in presenting and discussing the factors relating to [the] disbarment and reinstatement.

*Eddleman*, at 44. These criteria implement RLD 9.6(a)'s requirement that a petitioner for reinstatement show "that his or her reinstatement will not be detrimental to the integrity and standing of the judicial system or to the administration of justice, or be contrary to the public interest." *See In re Moynihan*, 113 Wn.2d 219, 221-22, 778 P.2d 521 (1989).

In every recent reinstatement case, this court has separately analyzed *each* of the *Eddleman* factors. *See Moynihan*, at 221-25; *In re McGrath*, 112 Wn.2d 481, 483-84, 487, 772 P.2d 502 (1989) (adopting the Board's separate analysis of each *Eddleman* factor); *In re Butler*, 110 Wn.2d 95, 98, 750 P.2d 641 (1988) (adopting the Board's separate analysis of each factor); *In re Stroh*, 108 Wn.2d 410, 413-19, 739 P.2d 690 (1987); *In re Rosellini*, 108 Wn.2d 350, 355-61, 739 P.2d 658 (1987).

The majority opinion breaks rank with these precedents. Instead of analyzing each aspect of the *Eddleman* test, the opinion focuses exclusively on what the majority sees as Hart's willingness to sacrifice ethical principles for the sake of personal expedience. Although it examines a number of different events from Hart's past, the majority evaluates those events solely in terms of what they reveal about Hart's ethical standards. *Eddleman* and its progeny require more than this.

My evaluation of the *Eddleman* criteria leads me to conclude that Hart should be conditionally reinstated to the

practice of law. In this evaluation, I give "considerable weight" to the Board of Governors' findings of fact because the Board heard testimony from the petitioner and the other witnesses, thereby enabling it to evaluate the credibility and demeanor of witnesses. *See Moynihan*, at 222; *Eddleman*, at 45. With these findings in mind, I would evaluate the relevant criteria in this case in the following manner.

1. Character, standing and professional reputation. The Board found that Hart's character, standing and professional reputation in the community in which he resided were "generally satisfactory". The Board based this finding on the favorable testimony submitted by "several knowledgeable and credible lawyers". Finding of fact 3. The record contains numerous letters supporting this finding.

2. Ethical standards of former practice.[1] The Board found that the ethical standards of Hart's former practice of law were "generally satisfactory", as reflected in the same favorable testimony that the Board relied on with respect to the first factor. Finding of fact 3. The majority quotes one letter from the record casting doubt on Hart's ethical qualities, but as the Board's findings indicate, other letters were submitted praising Hart's ethics and integrity.

3. Reason for disbarment. Hart stipulated to a disbarment in 1977 after being convicted of appropriating property belonging to the bankrupt's estate while Hart was acting as the estate's trustee. The Board stated that although these charges were serious, "there also was no finding in the criminal case that his wrongful actions had caused substantial harm to any person." Moreover, the Board concluded that the seriousness of the charge is more than outweighed by the severe punishment that Hart has suffered and the mitigating effect of the other *Eddleman* factors. Findings of fact 2, 5.

---

[1] Evaluation of this factor involves looking at conduct *other* than what led to the disbarment. *Moynihan*, at 223.

4. Sufficiency of punishment and payment of restitution. The Board found that Hart has undergone "quite substantial" punishment:[2]

> In addition to the criminal sentence [9 months served in prison], Hart's life was almost entirely destroyed by the indictment, conviction and disbarment. He lost not only his freedom but also his standing in the community; his wife became estranged when he was imprisoned; he was unable to earn substantial income even after release from his imprisonment; his personal and family life was continuously impaired; and finally inability to pay debts led him to have a bankruptcy petition filed in 1987 which ultimately resulted in a confirmed bankruptcy plan.

Finding of fact 4.

5. Postdisbarment attitude, conduct and reformation. The Board noted that since Hart's disbarment he had undergone a period of financial difficulties and had to support his family through employment other than law. The record reveals he now operates three profitable health clubs. The Board expressed concern over Hart's failure to file certain tax returns in the mid-1980's, but found it "significant that Hart [has since] filed his income tax returns and placed his financial house in order on his own initiative and efforts". Finding of fact 5. Because Hart has cured this problem, and because other mitigating factors exist in this case, the Board found that the problem "does not show such a lack of character or threat to clients as to warrant a continued disbarment." Finding of fact 5.

6. Length of time since disbarment. The Board found that the 14 years that have elapsed since Hart's disbarment constituted "sufficient time and progress since Hart's disbarment to demonstrate his entitlement to reinstatement." Finding of fact 6.

7. Current legal proficiency. Hart testified that he reads advance sheets approximately every 6 weeks. He stays in touch with other legal developments through his business activities and by reading the newspaper. Moreover, as the

---

[2]Payment of restitution is not a relevant consideration here, there being no indication in the record that Hart was ever ordered to pay restitution.

Board pointed out, he will have to pass the bar examination prior to being reinstated. *See Moynihan*, at 225; finding of fact 7.

8. <u>Sincerity re: disbarment and reinstatement</u>. The Board found that Hart has been sincere, frank and truthful in discussing his disbarment and potential reinstatement. Also, Hart "has been forthcoming in his approach to the process and his testimony to the Board." Finding of fact 8.

In light of these findings and my own review of the record, I cannot agree with the majority's statement that Hart is willing to "elevate personal expedience over respect for the law". Majority opinion, at 289. The majority's statement is based on ambiguous statements Hart made during his own bankruptcy proceeding and on his failure to file certain tax returns after his disbarment. Hart explained the apparent ambiguities in his testimony, and the Board found that Hart has since cleared up the problems surrounding his tax returns. Finding of fact 5.

What we have here is an attorney who made a mistake in 1977, but who has since paid dearly for that mistake. A majority of the Board found that Hart's readmission to the bar "is likely to be beneficial to clients and the general public" and "poses no substantial risk to anyone". Finding of fact 9. Accordingly, the majority of the Board concluded that Hart

> possesses the qualifications and meets the requirements as set forth in the Admission to Practice Rules for Lawyer Applicants, and his reinstatement will not be detrimental to the integrity and standing of the judicial system or to the administration of justice, or be contrary to the public interest.

Conclusion of law 13. I agree.

Reconsideration denied February 25, 1992.