

This opinion was filed for record

at _8:00am_ on _April 5, 2018_

_____, Deputy

for SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Bar Application of ) | No. 201,671-5 |
| ) | |
| TARRA DENELLE SIMMONS. ) | EN BANC |
| ) | |
| ) | Filed: _____ APR 0 5 2019 _____ |
| _____ ) | |

YU, J. — Determining moral character as a credential for practicing law has a long and intriguing history.[1] While lawyers may have more work to do in regard to how the public perceives our contributions to society, the evaluation of a bar applicant's character is an important step toward building confidence in our legal profession and our system of justice.

At this point in time, every state bar has some form of certification of moral character as part of its admission process. *See* NAT'L CONFERENCE OF BAR EXAM'S & AM. BAR ASS'N SECTION OF LEGAL EDUC. AND ADMISSIONS TO BAR,

---

[1] *See* Deborah L. Rhode, *Moral Character as a Professional Credential*, 94 YALE L.J. 491 (1985).

COMPREHENSIVE GUIDE TO BAR ADMISSION REQUIREMENTS (2018), http://www.ncbex.org/pubs/bar-admissions-guide/2018/mobile/index.html. Concerned with the morality of an applicant, the inquiry serves a legitimate interest in protecting the public and preserving a certain degree of professionalism. Nonetheless, we also know that throughout our history the standards used to assess moral character have shifted as society's norms and moral codes have changed. For example, categorical exclusions of women or rejection of applicants based on race, ethnicity, or sexual orientation were once generally accepted. But just as we have evolved in our understanding of humanity, we have also grown in our understanding of what makes a bar applicant a person of good moral character worthy of admission. Today, we affirm the principles that for purposes of bar admission, a moral character inquiry is determined on an individualized basis and that there is no categorical exclusion of an applicant who has a criminal or substance abuse history.

This case concerns a recent law school graduate's application to sit for the Washington State Bar Examination. Tarra Denelle Simmons has a challenging social history, including long-term substance abuse, multiple criminal convictions, and two bankruptcies. However, in the approximately five and a half years preceding her application to sit for the bar exam, Simmons successfully engaged in treatment for her substance abuse and childhood trauma. She has undisputedly

maintained her sobriety since September 2011 and has not been accused of any criminal or unethical behavior since then.

Simmons was entirely candid about her past when she applied to sit for the summer 2017 bar exam, and she readily provided further information as requested by counsel for the Washington State Bar Association (WSBA). Bar counsel referred Simmons' application to the WSBA Character and Fitness Board (Board), which recommended by a vote of six to three that Simmons' application be denied. We then reviewed her application and the Board's recommendation, heard oral argument on November 16, 2017, and granted Simmons' application in a unanimous order later that day.[2] Order, *In re Simmons*, No. 201,671-5 (Wash. Nov. 16, 2017). We now explain the reasons for our decision.

## BACKGROUND

Simmons was born to parents with substance abuse problems, and she grew up in poverty, surrounded by crime. She was the victim of many acts of sexual violence during her childhood and adolescence, and endured sporadic periods of homelessness beginning when she ran away at age 13. As a juvenile, Simmons was adjudicated for theft, possession of stolen property, and second degree assault.

---

[2] Simmons partially waived her right to confidentiality in these proceedings. This opinion therefore contains personally identifying information and is not redacted. Her application file otherwise remains sealed. *See* Admission and Practice Rule (APR) 24.1(g).

3

Simmons struggled with addiction for years, and her adult history includes a 2001 conviction for second degree assault and five 2011 convictions for organized retail theft, unlawful possession of a firearm, and possession of controlled substances. As a result of her criminal convictions, Simmons' nursing license was placed on probationary status, she served a total of over three years in jail and prison, and she underwent two bankruptcies and a foreclosure on her home.

However, when Simmons was sent to prison in late 2011, she began engaging in meaningful treatment for her trauma and addiction for the first time. Since then, she has changed her life to a degree that can only be deemed remarkable, both in terms of the efforts she has put forth and the positive results she has achieved. Wash. Supreme Court oral argument, *In re Simmons*, No. 201,671-5 (Nov. 16, 2017), at 38 min., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. Simmons has maintained her sobriety and conducted herself with complete openness and integrity over the past six years. She has been candid about her past, demonstrating sincere remorse and working diligently to make amends to her community as an outspoken advocate for civil legal aid with a focus on assisting formerly incarcerated individuals facing barriers to reentry.

Simmons attended the Seattle University School of Law and became the first student in her school's history to be awarded a two-year public interest fellowship

from the Skadden Foundation. She graduated magna cum laude as a dean's medal recipient in May 2017, and letters from faculty and classmates further make it clear that Simmons was a substantial asset to the entire law school community. Letters from her supervisors and colleagues also unequivocally state that Simmons excelled and exhibited consistently ethical behavior in the five legal internships she completed during law school, in addition to the volunteer and advocacy work that she undertook for no course credit.

Despite Simmons' about-face life choices, her extensive criminal history and recent substance abuse nevertheless gave bar counsel reasonable grounds to refer the matter for further consideration. Thus, counsel for the WSBA sent Simmons' bar application to the Board for consideration of whether Simmons

> 1) has demonstrated sufficient rehabilitation from her prior criminal conduct and addictions which contributed to that conduct, 2) now demonstrates that she conducts herself with a high degree of honesty, integrity and trustworthiness in her legal obligations, and 3) has the ability to conduct herself in a manner that engenders respect for the law and that adheres to the Washington Rules of Professional Conduct. In short, has she met her burden of proving that she currently has good moral character and fitness to practice law?

Mem. from WSBA Regulatory Servs. Dep't to Character & Fitness Bd. 3 (Apr. 11, 2017) (Memorandum).

The Board held a hearing on April 14, 2017. Simmons testified on her own behalf and offered testimony supporting her application from three people: the

youth policy director for the American Civil Liberties Union of Washington, a former litigator and administrative law judge, and a currently sitting superior court judge. Bar counsel presented no evidence and made no recommendation. The Board recommended to deny Simmons' application by a vote of six to three. Subsequently, Simmons asked this court to review her application and the Board's recommendation.[3]

## ISSUE

Has Simmons shown by clear and convincing evidence that she is currently of good moral character and possesses the requisite fitness to practice law?

## STANDARD OF REVIEW

The Admission and Practice Rules (APRs) comprehensively guide the Board's recommendation and our ultimate decision.[4] They do not, however, specify the standard by which we review the Board's recommendation, and we have not published an opinion on this topic in over 30 years. *See In re Wright*, 102 Wn.2d 855, 690 P.2d 1134 (1984); *In re Belsher*, 102 Wn.2d 844, 689 P.2d 1078

---

[3] Over the WSBA's objections, we granted Simmons' requests to use her full legal name in court filings, to hold oral argument in open court, and to announce our decision in a published, unredacted opinion. We also accepted a joint brief supporting Simmons' application from amici American Civil Liberties Union of Washington, 48 other organizations, 34 Washington attorneys, and 20 law school faculty members.

[4] The APRs were amended after the Board made its recommendation in this case. The amendments increased uniformity in the application process for different types of legal licenses and are not relevant to our analysis. This opinion therefore applies the current rules as amended effective September 1, 2017. APR 20.1.

(1984). We therefore first consider the appropriate standard of review, and take this opinion as an opportunity to provide clarity and guidance for the many bar applications that are not decided by published opinions.

Simmons and amici argue the standard of review is de novo and that the Board's recommendation should remain "'advisory only.'" *Belsher*, 102 Wn.2d at 854 (quoting *In re Simmons*, 81 Wn.2d 43, 45, 499 P.2d 874 (1972)). We agree. Our most recent opinions in bar admissions cases are clear that this court has the exclusive authority to decide bar applications in the first instance. *Wright*, 102 Wn.2d at 857; *Belsher*, 102 Wn.2d at 854. The current APRs are consistent with these prior holdings, providing that "[t]he Supreme Court of Washington has the exclusive responsibility and the inherent power to establish the qualifications for admission to practice law, and to admit and license persons to practice law in this state." APR 1(a).

While the WSBA agrees that the de novo standard should apply, it also asks this court to "consider whether to apply the 'substantial evidence' standard of review to the Board's factual findings in character and fitness matters." Answering Br. of WSBA at 28. After due consideration, we decline.

The WSBA points out that the Board's recommendation in bar application cases is similar to that of the hearing officer's recommendations in attorney discipline cases, where findings are explicitly reviewed for "substantial evidence."

Rules for Enforcement of Lawyer Conduct (ELC) 11.12(b), 12.4(a)(3). We note there are some similarities between attorney admissions and attorney discipline in terms of procedures, but the APRs do *not* explicitly refer to substantial evidence or to any other standard of review. We therefore adhere to our precedent holding that "[w]hile the findings and recommendations of the [Board] that petitioner is fit to practice law are entitled to considerable weight, they are not conclusive." *Belsher*, 102 Wn.2d at 854. Our review of the Board's recommendation is de novo.

## ANALYSIS

Lawyers are "entrusted with anxious responsibilities" to safeguard their clients' money, their confidences, and, in some cases, their lives. *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 247, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957) (Frankfurter, J., concurring). To protect against abuses of trust, anyone who seeks a license to practice law in Washington "must be of good moral character and possess the requisite fitness to practice law." APR 3(a).

However, while "good moral character" is essential for the ethical licensed practice of law, "[s]uch a vague qualification, which is easily adapted to fit personal views and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law." *Konigsberg v. State Bar*, 353 U.S. 252, 263, 77 S. Ct. 722, 1 L. Ed. 2d 810 (1957). Therefore, in 2006, we revised the APRs and defined "good moral character" and "fitness to practice law"

and provided detailed guidance on how to assess an applicant's character and fitness. APR 21, 22.

The current APRs provide for a preliminary review by bar counsel of all applications that indicate a possible character and fitness concern. APR 22.1(a)-(b). After gathering further information and conducting a review, bar counsel refers to the Board for further investigation and a hearing "any applicant about whom there is a substantial question whether the applicant possess[es] the requisite good moral character and fitness to practice law." APR 22.1(d). The Board will then conduct further inquiries, hold a hearing, and "[r]ecommend the approval or denial of an applicant's application." APR 23.1(a)(4). Where the Board recommends approval, the application is automatically reviewed by this court, which makes the final decision. APR 24.2(b)(1). If the Board recommends denial, the applicant may ask this court to review and decide the application. APR 24.2(b)(2). In this case, bar counsel referred Simmons' application to the Board, which recommended denial, and Simmons requested our review. We now apply the revised APRs for the first time in a published opinion.

A.    The Board's analysis relating to character and fitness

The Board's determination of an applicant's character and fitness is governed by APR 20-24. The specific rules that are most relevant in this case are APR 20 and 21. As framed by the Board, the question posed was "whether, in

9

light of Tarra Simmons' lengthy history of criminal and financial issues, she has proved to the Board by clear and convincing evidence that today she possess[es] the requisite good moral character and fitness to practice law in the State of Washington." Findings of Fact, Conclusions of Law, Analysis & Recommendation (Board Majority) at 2.

The Board entered in-depth findings of fact and conclusions of law supporting its recommendation. While we have reviewed each of the findings and conclusions of law, our analysis in this opinion is more limited because the Board's recommendation, in most essential aspects, is correct and unchallenged by the parties. As the Board rightly noted, Simmons, the applicant, bears the burden of proving by clear and convincing evidence that she is currently of "good moral character" as that term is defined by APR 20(c), and that she is currently fit to practice law and meets all five essential eligibility requirements to do so in accordance with APR 20(d)-(e). APR 24.1(c).

The APRs define "good moral character" as "a record of conduct manifesting the qualities of honesty, fairness, candor, trustworthiness, observance of fiduciary responsibilities, adherence to the law, and a respect for the rights of other persons and the judicial process." APR 20(c).

"Fitness to practice law is a record of conduct that establishes that the applicant meets the essential eligibility requirements for the practice of law." APR 20(d). The "essential eligibility requirements" are:

(1) The ability to exercise good judgment and to conduct oneself with a high degree of honesty, integrity, and trustworthiness in financial dealings, legal obligations, professional relationships, and in one's professional business.

(2) The ability to conduct oneself in a manner that engenders respect for the law and adheres to the Washington Rules of Professional Conduct.

(3) The ability to diligently, reliably, and timely perform legal tasks and fulfill professional obligations to clients, lawyers, LLLTs, LPOs, courts, and others.

(4) The ability to competently undertake fundamental legal skills commensurate with the lawyer, LLLT, or LPO license applied for, such as legal reasoning and analysis, recollection of complex factual information and integration of such information with complex legal theories, problem solving, and recognition and resolution of ethical dilemmas; and

(5) The ability to communicate comprehensibly with clients, lawyers, LLLTs, LPOs, courts, and others, with or without the use of aids or devices.

APR 20(e).

The Board's determination of moral character and fitness is guided by 14 different factors enumerated in APR 21(a) as well as aggravating and mitigating factors enumerated in APR 21(b). As directed by APR 21, the Board appropriately considered Simmons' prior criminal conduct, her financial difficulties, and the

probationary status of her nursing license. After considering all of these factors, the Board unanimously agreed that Simmons proved she met three of the five essential eligibility requirements: "[t]he ability to diligently, reliably, and timely perform legal tasks and fulfill professional obligations"; "[t]he ability to competently undertake fundamental legal skills"; and "[t]he ability to communicate comprehensibly." APR 20(e)(3)-(5).

However, the majority of the Board concluded that Simmons failed to meet two of these five essential eligibility requirements: "[t]he ability to exercise good judgment and to conduct oneself with a high degree of honesty, integrity, and trustworthiness in financial dealings, legal obligations, professional relationships, and in one's professional business" and "[t]he ability to conduct oneself in a manner that engenders respect for the law and adheres to the Washington Rules of Professional Conduct." APR 20(e)(1), (2); *see* APR 21(a)(1), (5), (7), (10), (12), (13).[5] We disagree with the Board regarding these two essential eligibility requirements, and we therefore disagree with its ultimate recommendation in this case.

---

[5] The Board correctly determined that APR 21(a)(2), (3), (6), (9), and (11) are not at issue in this case. We do not address APR 21(a)(4), (8), and (14) because even assuming (without deciding) that they are relevant here, they would merely require consideration of the same prior misconduct that we already consider in accordance with other relevant provisions.

B.    We disagree with the Board's assessment of Simmons' time in recovery and her attitude toward her prior conduct

The majority of the Board thought that Simmons had not yet spent enough time maintaining her sobriety and actively engaging in positive behaviors to establish a record of conduct consistent with good moral character and fitness to practice law. Second, the majority of the Board thought that "[s]ome of the attitudes she expressed in the record and at the hearing signal that her acquired fame has nurtured not integrity and honesty, but a sense of entitlement to privileges and recognition beyond the reach of others." Board Majority at 21. In light of the entire record presented, we do not agree.

1.    Simmons has been in recovery for enough time to establish a record of conduct showing her good moral character and fitness to practice law

The "recency of the conduct," the "absence of recent misconduct," and the "length of time in which the applicant has been in recovery" are all mandatory factors for our consideration. *See* APR 21(b)(2), (9)(i), (ix). We do not take lightly the length of Simmons' criminal history and substance abuse as compared to the length of time in which she has maintained sobriety, refrained from misconduct, and worked actively to make amends for her past behavior. We are also mindful that "this court's ultimate responsibility in matters relating to admission of attorneys is to guard the public and its confidence in the judicial system." *Belsher*, 102 Wn.2d at 850. However, we ultimately conclude that

13

Simmons' six-year record of complete sobriety, stable financial position, exemplary conduct, complete candor, and demonstrated ability to recognize and respond appropriately to situations that might lead to relapse is sufficient to persuade the court that she is highly likely to remain on her current path when she becomes a practicing attorney.

a.    We decline to adopt a bright-line rule

The parties have debated the merits of a bright-line rule for determining sufficient rehabilitation or recovery (for example, creating a rebuttable presumption after a certain number of years without relapsing or engaging in any misconduct). Although we seek to provide guidance in this opinion, we decline to adopt a specific time period as evidence of complete rehabilitation for all applicants because of the individualized inquiry of character and fitness, and the complexity of recovery.

We acknowledge that the rules governing disbarment do have specific time-based restrictions. *E.g.*, APR 25.1(b) ("No petition for reinstatement shall be filed within a period of five years after disbarment."). However, the rules governing new applicants do not. This is not an oversight. It reflects the fact that although we are guided by the "common purpose" of protecting the public and the profession in both new applications and reinstatements, *Belsher*, 102 Wn.2d at 851,

14

a new applicant with prior criminal or substance abuse issues is very different from a reinstatement applicant who has previously been disbarred.

In reinstatement cases, it has already been conclusively proved that the applicants previously failed to fulfill their professional responsibilities so egregiously that this court could not allow them to continue practicing law for the safety of the public and the good of the profession. *See In re Disciplinary Proceeding Against Fossedal*, 189 Wn.2d 222, 241, 399 P.3d 1169 (2017). We therefore do not allow previously disbarred attorneys to resume practicing law without proof that "that they have overcome the weaknesses that produced the misconduct for which they were disbarred." *In re Disciplinary Proceeding Against Hart*, 118 Wn.2d 280, 289, 822 P.2d 264 (1992).

New applicants, meanwhile, do not have previous lawful experience as independently practicing attorneys. *See Wright*, 102 Wn.2d at 861 (disapproving of the applicant's prior unauthorized practice of law). Thus, unlike a previous disbarment, prior misconduct by a new applicant rarely provides "conclusive evidence" that the applicant lacks good moral character and is not fit to practice law. *Belsher*, 102 Wn.2d at 851.

Moreover, there is a punitive aspect to attorney discipline, and particularly to disbarment. The time restrictions on seeking reinstatement serve not only to protect the public but to penalize the disbarred attorney for abusing the trust of the

legal profession and his or her former clients. *See Fossedal*, 189 Wn.2d at 241. New applicants have never held that trust. Therefore, instead of attempting to punish them for their past misconduct ourselves, we consider the "sufficiency of punishment" they have already received as one of many factors when we evaluate their applications.[6] APR 21(b)(9)(iii).

Because the WSBA simply does not have any directly comparable evidence by which to judge how new applicants will conduct themselves in the licensed practice of law, cases involving new bar applicants must be considered in an individualized manner. Specific time-based rules, or even flexible presumptions, are not appropriate, and we decline to adopt any at this time.

b.   We follow evidence-based practices for evaluative purposes

Although we cannot adopt a generally applicable time-based rule, we are presented in this case with current, credible social science research of undisputed validity about the relationship between the duration of a person's sobriety and positive conduct and the person's reduced likelihood of relapsing or recidivating.[7] This research reveals that 86 percent of addicts who maintain their sobriety for at

---

[6] In this case, it is undisputed that the legal, financial, and personal consequences Simmons has already faced are sufficient punishment.

[7] APR 21(b)(9)(ix) actually mandates consideration of "expert opinion that the period of treatment, recovery, or remission is adequate for the applicant to meet the essential eligibility requirements for the practice of law" if the "length of time in which the applicant has been in recovery or remission, where applicable, . . . is less than two years." And without question, nothing precludes consideration of such information if more time has passed.

least 5 years will never relapse, but that there is no further substantial decrease in the likelihood of relapse after 10 years have passed. Michael L. Dennis, Mark A. Foss & Christy K. Scott, *An Eight-Year Perspective on the Relationship between the Duration of Abstinence and Other Aspects of Recovery*, 31 EVAL. REV. 585, 604 (2007); *see also* John M. Nally, Susan Lockwood, Taiping Ho & Katie Knutson, *Post-Release Recidivism and Employment among Different Types of Released Offenders: A 5-Year follow-up Study in the United States*, 9 INT'L J. CRIM. JUST. SCI. 16 (2014). Simmons has maintained her sobriety and exemplary conduct for over six years at this point. The research presented therefore indicates that she has reached the stage where her new positive behaviors are highly likely (in fact, about as likely as they ever will be) to represent lasting change, rather than the tenuous early stages of recovery. *Contra* Board Majority at 20-21 (describing Simmons' efforts thus far as "tender," "still fragile," and "still in their infancy").

Moreover, before Simmons was sent to prison in 2011, she lacked the insight to realize she was addicted to her controlled prescription medications and she did not meaningfully engage in any treatment for her childhood trauma and lifelong substance abuse issues. However, upon Simmons' incarceration, she not only engaged in treatment but advocated for opportunities to engage in further treatment that would not normally be available to her because she was assessed at a very low risk to reoffend. Simmons has also successfully developed a large,

dependable support network and has proved her ability to effectively implement strategies minimizing any risk of future relapses, criminality, self-destructive behaviors, or avoidable financial problems.

In 2016, Simmons' updated substance abuse evaluation recommended no further treatment and Simmons became the first person in Washington to be awarded a "Certificate of Restoration of Opportunity" pursuant to chapter 9.97 RCW. The WSBA is explicitly exempt from affording the legal protections granted by this certificate. RCW 9.97.020(1)(a)(i). We nevertheless consider it reliable evidence that Simmons has maintained her exemplary conduct and has earned the legal right to many employment opportunities or second chances that would otherwise be unavailable due to her criminal history.

We also take particular note in this regard of a letter supporting Simmons' application from her pastoral counselor, which is reliable "corroborating evidence[ ] of a desire and intent to engage in exemplary conduct in the future." APR 21(b)(9)(vi). This counselor has known Simmons personally for over 20 years and wrote persuasively of Simmons' long, difficult, but ultimately successful journey. This evidence weighs heavily against the argument that Simmons' misconduct is simply too recent, or that the number of years for which Simmons has maintained her sobriety is simply insufficient at this time.

Finally, even though we are aware that being a licensed attorney is challenging, we give considerable weight to the stress Simmons has already faced, the extraordinary strength of character she has demonstrated, and the fact that she has proved herself capable of handling high-pressure situations without relapsing over the past six years. Simmons maintained her sobriety, stayed current on her debts, and demonstrated exemplary conduct while handling the simultaneous pressures of law school, commuting, motherhood, volunteer work, and APR 9 internships, and she excelled in every area.

We therefore do not view the recency of Simmons' prior misconduct as a negative factor, and we view favorably both her absence of recent misconduct and the length of time she has been in recovery given how far she has come to get to this point.

2. Simmons has demonstrated candor, insight, and respect for the law showing her good moral character and fitness to practice law

While the Board acknowledged that Simmons was completely candid and accepted full responsibility for her prior conduct, the Board was concerned that Simmons did not sufficiently understand the concerns raised by her prior misconduct and that her success has engendered in her an inappropriate sense of entitlement. These apprehensions raised questions for the Board about whether Simmons has a record demonstrating "respect for . . . the judicial process," whether

she has shown the "ability to conduct [her]self in a manner that engenders respect for the law," and her "attitude toward the misconduct, including without limitation acceptance of responsibility and remorse." APR 20(c), (e)(2); APR 21(b)(9)(v). Considering the entire record, we find that Simmons is candid, sincere, and remorseful.

a.    Simmons did not minimize her drug use

The Board found that Simmons "minimize[d] her historical drug activities" by failing to disclose in her initial bar application that she went through a six- to nine-month period of substance abuse in 2005, which resulted in brief inpatient treatment but no criminal charges or other direct, negative consequences. Board Majority at 17. The Board also felt that Simmons did not adequately acknowledge the concerns presented by a period beginning in 2009 during which she took opioid and amphetamine medications as prescribed by her doctors for chronic pain and mental health reasons. By 2011, Simmons was trading and selling those medications in exchange for methamphetamine. We agree with the Board that those periods of substance abuse are relevant concerns, but we do not agree that Simmons attempted to minimize or conceal them.

First, there was no question on the bar application that required Simmons to disclose her 2005 substance abuse. Indeed, it is doubtful that any question in the initial bar application lawfully *could* require such a disclosure given recent

amendments to the APRs in accordance with the federal Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213. *See* GR 9 Cover Sheet; U.S. Dep't of Justice, Office of Pub. Affairs, *Department of Justice Reaches Agreement with the Louisiana Supreme Court to Protect Bar Candidates with Disabilities* (Aug. 15, 2014), https://www.justice.gov/opa/pr/department-justice-reaches-agreement-louisiana-supreme-court-protect-bar-candidates [https://perma.cc/6J7C-M9D4]. We must take an exclusively conduct-based approach to character and fitness review, and the existence of "drug or alcohol dependence, a health diagnosis, or treatment for either" cannot be an independent factor in the Board's consideration or our own, and the existence of any such condition cannot be a question on the bar application. APR 22.1(e).

Nevertheless, when bar counsel determined that such information was relevant in this case, Simmons readily provided her confidential medical records in response, and she spoke openly about her 2005 substance abuse at her hearing with the Board. The failure to voluntarily disclose information that, by federal law, cannot be requested without specific justification does not evince an attempt to conceal or minimize that information. We are therefore not concerned by the time and manner in which Simmons disclosed her 2005 substance abuse to bar counsel and the Board, and it is not a negative factor in our analysis.

Second, the Board was concerned by Simmons' candid admission that when she was taking addictive prescription medications, she was generally functional and did not recognize that she had a problem. Verbatim Report of Proceedings (VRP) (Apr. 14, 2017) at 144-45, 156-57. However, she now realizes that she was addicted to those medications and knows that in the future, she cannot return to such addictive behaviors. *Id.* Given Simmons' current depth of insight, her prior lack of insight is not probative of her current moral character and fitness to practice law.[8]

b.     Simmons' attitude is not inappropriate

The Board believed that Simmons demonstrated a "sense of entitlement to privileges and recognition beyond the reach of others" based on her inquiry as to whether her application needed to be referred to the Board and based on the public recognition that she has received for her remarkable success. Board Majority at 21. We cannot agree with the Board's assessment.

We wholeheartedly agree that Simmons has *attained* privileges and recognition beyond the reach of others due to her hard work. For instance, she has

---

[8] At oral argument, bar counsel contended that Simmons used the word "sorry" only once at her hearing before the Board, evincing a lack of remorse. Wash. Supreme Court oral argument, *supra*, at 44 min., 50 sec. We summarily reject the premise that this word count is an appropriate basis on which to evaluate Simmons' moral character. We therefore also decline to draw any inferences from the number of times that Simmons referred to her Skadden fellowship or the Skadden Foundation at her hearing. *Id.* at 27 min., 26 sec.

the privilege of serving as cochair on the board of the Washington Statewide Reentry Council, and the recognition of graduating magna cum laude as a dean's medal recipient and the first Skadden fellow in her law school's history. Such things are indeed beyond the reach of most others. But Simmons did not attain her current privileges and recognitions through entitlement. She earned everything she has through dedication, talent, and a staggering amount of hard work. Simmons rightly takes pride in her extraordinary accomplishments, but there is no evidence that she expects special treatment.

The Board was concerned because it thought that Simmons referred to the Board hearing as "'unnecessary'" and that this statement indicated Simmons believed she was entitled to have her application granted without further inquiry. Board Majority at 17. In her initial application to the WSBA, which was available to the Board but directed to bar counsel, Simmons stated in part:

> "An unnecessary referral to the Character and Fitness Board would add little to assure the Washington Supreme Court of my current fitness and good character necessary to practice law, which is more than fully documented in this application and supporting materials . . . A referral to the Character and Fitness Board would be particularly harmful in my case because I have been awarded the Skadden Fellowship to serve the legal needs of a vulnerable population."

Answering Br. of the WSBA at 15 (alteration in original).[9] We do not view this as reflecting a belief by Simmons that the Board review process is unnecessary. Rather, Simmons' language in her application is consistent with her testimony to the Board that she was asking bar counsel to exercise its discretion to consider the record and the circumstances presented and decline to refer Simmons' application to the Board.[10] VRP at 160-61; *see* APR 22.1(c), (d).

Bar counsel apparently did not view Simmons' question about whether a referral was necessary as a negative factor at the time because it was not mentioned in counsel's referral memorandum to the Board. And when bar counsel decided a referral was needed, there is no evidence that Simmons complained or protested. Furthermore, at her hearing, Simmons "exhibited complete candor" and "was thorough and thoughtful in her presentation." Board Majority at 15.

We also note that there is absolutely no published case law about how bar counsel decides whether a board referral is needed on the basis that there is "a substantial question whether the applicant possess[es] the requisite good moral character and fitness to practice law." APR 22.1(d); *see* TOM ANDREWS, ROB

---

[9] The actual letter is not in the record available for our review, but we rely on counsel's unchallenged representation as to its contents as "the kind of evidence on which reasonably prudent persons are accustomed to rely on [in] the conduct of their affairs." APR 24.1(e)(2).

[10] We also note that while Simmons eventually learned that her Skadden fellowship was secure regardless of the Board's recommendation, it is undisputed that she did not have that information when she applied to sit for the bar exam.

ARONSON, MARK FUCILE & ART LACHMAN, THE LAW OF LAWYERING IN WASHINGTON 2-20 (2012) (noting that without published opinions, bar applications remain "a guessing game for those who contemplate admission"). It may well have seemed obvious to experienced bar counsel and members of the Board that a character and fitness referral was inevitable in this case. However, it is not reasonable to assume that a first-time applicant should have the same perspective, even if the applicant received advice from a distinguished attorney when preparing her application, as Simmons did.

Asking whether a board referral was necessary under these circumstances does not evince "a sense of entitlement to privileges and recognition beyond the reach of others." Board Majority at 21. It evinces the type of reasonable advocacy any litigator could ethically exercise on behalf of his or her clients, and likewise probably would exercise on his or her own behalf. It is entirely appropriate conduct for a person who wants to be a lawyer.

To the extent that the Board was also concerned that Simmons had developed an unwarranted sense of entitlement due to her "acquired fame," we do not share the Board's view. Board Majority at 21. Simmons' public recognition is not evidence that she is acting for her own gratification or to satisfy her own ego. The publicity that Simmons has received supports her continuing sobriety and exemplary conduct and is an important component of her career mission.

As Simmons explained at her hearing, the fact that she is well known in her field supports her continued exemplary conduct, not only because it reinforces her hard-earned sense of self-worth but also because it makes her accountable. VRP at 163, 166. Having a community support network to which she is accountable is likely to remain an important positive factor in Simmons' life, as are her education and her continued access to employment and stable housing. *See generally* Mark T. Berg & Beth M. Huebner, *Reentry and the Ties That Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 JUST. Q. 382 (2011); Jennifer E. Cobbina, *Reintegration Success and Failure: Factors Impacting Reintegration among Incarcerated and Formerly Incarcerated Women*, 49 J. OFFENDER REHABILITATION 210 (2010); Byron Harrison & Robert Carl Schehr, *Offenders and Post-Release Jobs: Variables Influencing Success and Failure*, 39 J. OFFENDER REHABILITATION 35 (2004); Nally et al., *supra*.

The work Simmons intends to do is also necessarily benefited by the publicity her case has received. Simmons does not use the publicity she has gained from her experience for personal recognition or to seek special favors. She uses her experience to help others, just as she did when she sponsored other women on their paths to sobriety in Narcotics Anonymous, which, as the organization's name suggests, one does not do for the sake of publicity. Words about the possibility of recovery and providing opportunities to those who have failed in the past are

undeniably not as powerful without specific individuals like Simmons, who prove

that rehabilitation is possible in both fact and in law. Particularly in this context, it

is unreasonable to expect that an extraordinary applicant like Simmons could

comply with her duty to be completely candid *without* attracting significant public

attention.

On the issue of Simmons' publicity and attitude toward her prior conduct,

we also note a particularly relevant recommendation that the Board made in a

previous case, which was not decided in a published opinion.[11] There, the Board

unanimously recommended to grant the application of the man who would become

one of Simmons' attorneys in this case, Shon Hopwood.[12]

Unlike Simmons, Hopwood grew up in a relatively emotionally and

financially stable family. He did not struggle with addiction or abuse, but he did

struggle personally and financially. After his honorable discharge from the United

---

[11] We do not mean to imply that just because any one application is granted, some other application must be granted as well. As noted above, each new applicant must be considered individually, such that every case is distinguishable from every other in many ways. We therefore limit our comparison of the recommendations made in different applications to this particular point in our analysis.

[12] We take judicial notice of the fact that Hopwood's story is well known within the legal community. *See, e.g.*, Tony Mauro, *Shon Hopwood's Amazing Legal Journey to be Featured on "60 Minutes*," NAT'L L. J. Oct. 12, 2017, https://www.law.com/nationallawjournal/sites/nationallawjournal/2017/10/12/shon-hopwoods-amazing-legal-journey-to-be-featured-on-60-minutes/ [https://perma.cc/NFY2-EM9Y]. Furthermore, Hopwood waived his right to confidentiality in the Board's recommendation in his case, the WSBA did not oppose our considering it, and we have previously considered comparable evidence in disciplinary cases. *See In re Disciplinary Proceeding Against McGrath*, 178 Wn.2d 280, 286, 308 P.3d 615 (2013).

States Navy, he participated in a string of armed bank robberies in Nebraska in his early 20s. He pleaded guilty to "five felony counts of bank robbery and one felony count of using a firearm during a crime of violence" and served a 10-year prison sentence. Tarra Denelle Simmons' Mot. for Judicial Notice & to Expand R., Attach. C at 2. After Hopwood completed his sentence and went on to excel in law school, this court granted his application to sit for the bar exam in 2014 in accordance with the Board's unanimous recommendation. His ethics and abilities as an attorney have never been questioned, and he is, by all accounts, a credit to the profession.

Both Hopwood and Simmons are living examples of a person's ability to change if he or she has the will and opportunity to do so. Both of their stories attracted media attention, and both of them openly and publicly shared their stories for the benefit of others. Both received extensive support for their applications from the public and from distinguished members of the legal community. The Board found them both to be candid and credible. There is no dispute that both Simmons and Hopwood generally present themselves in a professional and courteous manner, and there is no reason to believe that either one behaved uncharacteristically at the board hearing. Although every bar applicant is unique, we do not believe there is a sufficient basis on which to differentiate between

Hopwood's and Simmons' respective attitudes toward their prior misconduct and the publicity they have received, except for their gender.[13]

We also give more weight to the testimony and letters supporting Simmons' application than the Board did. While it is true that many of Simmons' supporters had known her for three years or less at the time she applied, that is not at all relevant to the question of whether Simmons currently displays an unwarranted sense of entitlement. The people who testified and wrote in support of Simmons' application unquestionably interacted with her as she presents herself today. This support comes from an extraordinarily wide array of individuals, including a volunteer at the Mission Creek Corrections Center for Women who first met Simmons while she was incarcerated, Simmons' supervisors at the first places where she worked after her release from confinement (which were not high-profile settings but a fast food restaurant and a property management company), currently sitting Washington judges at both the trial and appellate levels, the dean of the

---

[13] Much has been written about the difficult questions that arise when making the necessarily subjective determination that a person is or is not of good moral character and fit to practice law. *E.g.*, Jon Bauer, *The Character of the Questions and the Fitness of the Process: Mental Health, Bar Admissions and the Americans with Disabilities Act*, 49 U.C.L.A. L. REV. 93 (2001); Rhode, *supra*. While we disagree with the Board's recommendation in this case, we do *not* hold that it acted arbitrarily. *See* Wash. Supreme Court oral argument, *supra*, at 23 min., 57 sec. We also note that Simmons "makes no allegation of bias in this case." Reply Br. of Applicant Tarra Denelle Simmons at 1 n.1; *cf.* RAP 12.1(a). We therefore do not explore potential indicators of bias, and note only that it is extremely important for the WSBA and the courts to ensure that they are sufficiently informed to make subjective judgments about applicants with histories of substance abuse, criminal convictions, and financial problems.

Seattle University of School of Law and many law school faculty members, and respected practicing attorneys ranging from the elected King County prosecuting attorney to a staff attorney for the American Civil Liberties Union of Washington. It is undisputed by Simmons' many supporters that she consistently displays the utmost integrity, compassion, and dedication. We simply do not believe that so many people would put their own reputations at risk with no benefit to themselves to give their unequivocal support to a person who evinces an unwarranted sense of entitlement.

We conclude that the majority of the Board did not give sufficient weight to the level of personal insight Simmons has demonstrated, and that the Board erred in viewing Simmons' publicity and the pride she rightly takes in her accomplishments as negative factors. Simmons has shown she has "respect for . . . the judicial process" and the "ability to conduct [her]self in a manner that engenders respect for the law." APR 20(c), (e)(2). We also do not view Simmons' "attitude toward the misconduct, including without limitation acceptance of responsibility and remorse" as a negative factor in this case. APR 21(b)(9)(v).

C.     Simmons has met her burden of proof

We hold that Simmons has shown by clear and convincing evidence that she is currently of good moral character and she is fit to practice law. Simmons has spent enough time in recovery, and she accepts full responsibility for her prior

30

conduct. She has consistently demonstrated remorse, self-awareness, fortitude, and an unwavering dedication to earning and maintaining the respect of the profession. Her success during law school, both academically and in supervised internships, amply demonstrates she is worthy to sit for the bar. Indeed, given the substantial obstacles that she has overcome, her success is an even stronger indicator of her abilities than it would be for the average law student. As noted by Dean Annette E. Clark of the Seattle University School of Law, unlike Simmons, "[m]any of our law students have lived lives of privilege, and so when we attest to their character and fitness to practice law, it is under circumstances where they have not been tested in any meaningful sense by circumstances such as poverty, substance abuse, and domestic violence." Memorandum, Attach. B at 114. Simmons, meanwhile, has overcome all of those circumstances and more. Her remarkable achievements would simply not be possible without her extraordinary abilities and relentless hard work.

We grant Simmons' application to sit for the bar exam.

## CONCLUSION

A license to practice law is a privilege, and the decision to grant such a license is not made as a matter of right or as a matter of grace. It is a challenging decision that requires a searching review by bar counsel, the Board, and this court wherever an applicant's prior conduct raises concerns about his or her current

character and fitness. The inquiry involved in evaluating a person's moral character is easier said than done. It involves weighing a variety of factual circumstances involving extremely personal considerations, with an eye toward protecting the public while upholding a consistent, bias-free, and evenhanded application of general guidelines. Nevertheless, it is a decision that must be made on a regular basis in our self-governing profession. We do not discount the difficulty of the Board's duty in this regard.

At oral argument, bar counsel specifically asked this court, regardless of its ultimate decision, to refrain from holding that the Board acted arbitrarily in making its recommendation. We take this opportunity to make it very clear that this court never considered such a holding. We do not intend to undermine the authority of the Board or the respect due to the Board and to bar counsel, nor do we mean to suggest that the Board's recommendation was made in bad faith. We simply disagree with the Board's recommendation in this particular case.

Simmons has proved by clear and convincing evidence that she is currently of good moral character and fit to practice law. We affirm this court's long history of recognizing that one's past does not dictate one's future. We therefore unanimously grant her application to sit for the bar exam.

_____  ~~Sin, Jr~~

WE CONCUR:

_____  _____
Fairhurst, C.J.                     Stephens, J.

_____  _____
Johnson, J.                         Wiggins, J.

_____  _____
Madsen, J.                          Gonzáles, J.

_____  _____
Owens, J.                           González, J.

33